State v. Nur
*[Cite as 4 AOA 295]*

*Case No. 57132*
*Cuyahoga County, (8th)*
*Decided June 21, 1990*

John T. Corrigan, Esq., Cuyahoga County Prose-cutor, Justice Center, 1200 Ontario Street, Cleveland, OH 44113, for Plaintiff-Appellee.

Robert M. Ingersoll, Esq., Public Defender's Office, Marion Building, Room 307, 1276 West Third Street, Cleveland, OH 44113, for Defendant-Appellant.

MATIA, J.

Defendant-appellant, Yaqub Abdul Nur, a.k.a. James Starr, appeals from his conviction in the Cuyahoga County Court of Common Pleas for the offense of murder. R.C. 2903.02.

### I. THE FACTS, GENERALLY

In its case-in-chief the state presented the testimony of Cory Pettis, who was nineteen years old at the time of trial. Cory testified that on Saturday, April 2, 1988, he and two of his cousins, Maurice and Shawn Pettis, were returning to his home at East 135 and Glenside Road after having gone to a convenience store for a sandwich and a bottle of beer. Cory stated that he had had nothing alcoholic to drink that day, although Maurice and Shawn had been drinking beer earlier in the day. When the three boys reached the corner of Hayden Avenue and Glenside Road, Maurice and Shawn went into an alley behind a building owned by Muslims and urinated. Cory testified that to him the building appeared vacant since the windows had been boarded up.

Cory, who had been walking a few steps ahead of his cousins walked back to find his cousins talking to a Muslim who was telling Maurice and Shawn not to enter or urinate on his property. Cory testified that he told the Muslim it would not happen again, and offered an apology on behalf of his cousins. At that time, another Muslim came out of the building and began punching Shawn in the face. Appellant came out of the building third. A total of at least ten black male Muslims came out of the building, all wearing robes and skull caps. A fight ensued.

Cory testified that during the fray appellant reached into his robe, pulled out a curved, three to four inch, apparently homemade ring-knife, and placed it on his finger. Appellant approached Shawn, who had been punched to the ground two houses down the street from the Muslim building. Appellant hit Shawn in the chest with the knife while he was laying on the ground. Seeing this, Cory swung the bag with the bottle in it at appellant, but the bag ripped. Appellant began to approach Cory, but then made a detour toward Maurice, who was fighting with another Muslim. Appellant punch-stabbed Maurice in the back.

Appellant and two other Muslims then came back toward Cory. Cory testified that appellant was telling him "You're next, you're next." Although all three Muslims were attempting to reach and hold Cory, Cory managed to avoid appellant's swinging of the ring-knife. At this point, several of Cory's relatives came out of their apartment building, which was only approximately five houses down the street from the Muslim building. The incident ended, and police and EMS arrived approximately five minutes later.

Cory testified that appellant went into the Muslim building before the police arrived, but came back out and was identified by Cory as the knife-wielder. Appellant was searched, revealing what appeared to be a leather sheath but no knife, and then placed in the back of a patrol car.

None of the injuries to the victims were sustained on the Muslim property.

Maurice Pettis testified, corroborating much of his cousin Cory's testimony. Maurice stated that he also lived at East 135 and Glenside Road, and was nineteen years old at trial. Maurice admitted he had been drinking heavily on April 2, 1988, prior to the incidents *sub judice*, and that he and his cousin Shawn urinated on the outside wall behind the Muslim building at Hayden Avenue and Glenside Road.

Maurice stated that a young boy from the building saw him and Shawn urinating, and then ran back into the building. Moments later, three to five Muslims came out of the building and a fight ensued. While Maurice was fighting two of the Muslims, he was stabbed in the back. Maurice did not know who stabbed him. He did, however, identify appellant as one of the Muslims involved in the altercation, and further testified that he saw a "pointed object" on appellant's hand. Maurice testified that he did not see any other weapons. Soon after being stabbed Maurice fainted. He woke up in the hospital on the following day, Easter Sunday.

Sabrina Pettis, like her cousins, Maurice and Cory, was nineteen years old at trial and lived in the same building at East 135 and Glenside Road. On the date in question, she had been barbecuing on a second floor porch or balcony overlooking Glenside Road when she saw Cory "running back and forth with his fist up". Sabrina ran through her home and outside to see three Muslims, including appellant, moving toward Cory. Sabrina testified that appellant had a silver-colored, triangular knife between the fingers of his right hand. Sabrina and Cory ran into their building.

After a short while, Sabrina went back outside and walked down the street, where she saw Shawn laying on the ground with his eyes closed, and with blood on his clothes and on the ground.

Dr. Robert Challener of the Cuyahoga County Coroner's Office testified that he performed the autopsy on the corpse of Shawn Pettis. Dr. Challener testified, referring to photographs, that Shawn had a one-fourth inch cut on the inside of his lower-lip, and a one-inch wide stab wound in the middle of his back which led between his ribs and into his chest cavity. Further, Shawn had a similar two-inch deep stab wound in his chest which transected cartilage and penetrated the right ventricle of Shawn's heart, causing his death at 4:15 a.m. on Easter Sunday, April 3, 1988.

Dr. Challener testified that both wounds were forceful stabs "to the hilt", or the handle of the knife. The coroner's verdict was, of course, homicide.

Cleveland Police Patrol Officer Gerald Crayton testified that he and his partner were first to respond to a call on April 2, 1988, regarding a "male stabbed" at Glenside Road. Upon arrival at the scene he encountered a large crowd of people, and saw two males laying on the sidewalk "being stabbed".

After appellant was identified to Officer Crayton as the man who had done the stabbing, appellant was taken into custody. Upon searching appellant, Officer Crayton confiscated from around appellant's neck a "leather strap necklace", on the end of which was an empty small leather sheath which appeared to Officer Crayton as though it would contain a knife. The sheath was approximately three inches long and triangular in shape.

For the defense, Imam Abdu Malik, a.k.a. William Larry Thomas, testified that he is a Muslim minister, and the administrator of the Muslim school located at Hayden Avenue and Glenside Road. Imam Malik testified that appellant is active in their community, and is the parent of three students of the school. On April 2, 1988, approximately eight Muslims, including appellant, were conducting a meeting in the building when a young student came in and told them a man was urinating on the school grounds. The men went outside to investigate. When he first came out, Imam Malik saw three men arguing with a Muslim brother who had come from another Muslim building across the street. Imam Malik testified that he approached the three men, explained to them that what they had done was wrong, and suggested that they go back and clean it up. The three became belligerent and a fight ensued, during which Cory Pettis swung a bottle at appellant.

After a few minutes, Imam Malik went back to lock up the building. When he came back out, appellant was walking back towards the building and someone informed Imam Malik that there had been a stabbing. Imam Malik testified that he walked down the street and saw Shawn Pettis laying on the ground in a lot of blood. Imam Malik stated that he saw no stabbing, and never talked to anyone in his congregation about any stabbings.

In his own defense, appellant testified that he fought only with Cory, not Shawn or Maurice Pettis. Appellant stated that he did not have a weapon, saw no knives at all, and he did not see any stabbings, although he remained outside the whole time. Essentially, it was appellant's position that he stabbed no one, and that the state's witnesses were mistaken.

With regard to the confiscated sheath, Joint Exhibit 2, appellant testified that such was used to hold a key, not a knife, but that somebody

removed the key after it was taken from him. Appellant denied having disposed of any knife.

On December 16, 1988, the jury returned their verdict, finding appellant guilty of the murder of Shawn Pettis, the prosecutor having amended the indictment to murder from aggravated murder (with specifications of mass murder and a prior aggravated felony conviction for armed robbery). The jury found appellant not guilty of the attempted murder of Maurice Pettis. Judgment was rendered thereon.

The Cuyahoga County Public Defender's Office timely filed an appellate brief assigning five assignments of error, and appellant subsequently filed his own appellate brief *pro se* assigning six additional errors for our review, some of which are encompassed with the brief of the public defender.

## II. MOTION TO SUPPRESS

Both of appellant's briefs first assign error in the failure of the trial court to suppress eyewitnesses identification:

"Public Defender Assignment of Error No. 1:
"YAQUB NUR WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL, WHEN THE TRIAL COURT FAILED TO SUPPRESS EYEWITNESS IDENTIFICATIONS WHICH WERE THE RESULT OF A SUGGESTIVE PHOTOGRAPHIC ARRAY.'"

"*Pro se* Assignment of Error No. 1:
"THE TRIAL COURT ERRED IN NOT SUPPRESSING THE IDENTIFICATION OF THE APPELLANT'S PHOTOGRAPH."

Prior to trial, a hearing was held on appellant's motion to suppress. Appellant believes that he was denied due process as a result of the police having shown Cory Pettis a single photograph of appellant several weeks after the incident. The trial court denied the motion.

Since Maurice Pettis never identified appellant as his or Shawn's attacker, and Sabrina Pettis was never shown the photographs at all, the sole issue here is the eyewitness testimony of Cory Pettis. The photograph of appellant was not used at trial and was never admitted into evidence.

A court must look to the *totality of the circumstances* surrounding a claimed violation of due process in the conduct of a confrontation. *Stovall* v. *Denno* (1967), 388 U.S. 293. A two-step analysis is used in challenges of this sort. First, the court considers whether the pretrial identification procedure is unnecessarily and unduly suggestive. However, *reliability* is "the linchpin in determining the admissibility of identification

testimony". *Manson* v. *Brathwaite* (1977), 432 U.S. 98. Thus, even if the procedure utilized was suggestive, as long as the identification itself is otherwise sufficiently reliable, the identification is admissible. *State* v. *Moody* (1978), 55 Ohio St. 2d 64; *State* v. *Phillips* (April 13, 1989), Cuyahoga App. No. 55214, unreported.

Factors determining the degree of reliability include:

"* * * the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil* v. *Biggers* (1972), 409 U.S. 188, 199.

In the instant case, the display of but a single photograph was certainly suggestive. However, Cory Pettis' identification of appellant was otherwise sufficiently reliable under the above-quoted factors, and therefore was admissible.

Cory had more than ample opportunity to view the appellant in broad daylight in the middle of the afternoon. His degree of attention on appellant was certainly high, considering the fact that appellant was approaching him with a knife. Moreover, it was only a matter of minutes between the crime and Cory's identification of appellant to the police upon their arrival at the scene.

Under the totality of the circumstances, the trial court did not err in denying appellant's motion to suppress, since Cory's identification testimony displayed sufficient indicia of reliability. Accordingly, both of appellant's first assignments of error are not well taken.

## III. PROSECUTORIAL MISCONDUCT

If both third assignments of error, appellant contends that the prosecutor made repeated improper remarks during trial and closing argument, denying appellant his right to a fair trial.

Public Defender Assignment of Error No. 3:
"YAQUB NUR WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BEFORE A JURY NOT FREE FROM OUTSIDE INFLUENCES, BY REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT CALCULATED TO INFLAME THE JURY."

"*Pro se* Assignment of Error No. 3:
"AN ACCUSED IS DENIED A FAIR TRIAL WHEN THE PROSECUTION MAKES IRREL-

EVANT AND SUGGESTIVE REMARKS IN THE PRESENCE OF THE JURY."

In *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, the Ohio Supreme Court stated:

"Ohio courts have suggested that the effect of counsel's misconduct 'must be considered in the light of the whole case.' See, *e.g., Mikula* v. *Balogh* (1965), 9 Ohio App. 2d 250, 258 [38 O.O.2d 311].

"* * *

"*In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial.*'" (Citations omitted; emphasis added).

Further, the court stated in *State* v. *Smith* (1984), 14 Ohio St. 3d 13, at 14:

"'The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'"

There is no prejudicial error if it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found appellant guilty. *Smith, supra,* at 15; *State* v. *Wright* (Nov. 30 1989), Cuyahoga App. Nos. 56338 and 56339, unreported.

In the instant case, even if the prosecutor's comments were improper, no prejudicial error occurred. A careful review of the totality of the evidence reveals that there was overwhelming proof of appellant's guilt beyond a reasonable doubt. It is clear that, even absent the prosecutor's comments, the jury would have found appellant guilty. Appellant's third assignments of error are not well taken.

### IV. WEIGHT OF THE EVIDENCE

In appellant's *pro se* second assignment of error, and the public defender's fourth assigned error, the conviction is challenged as being against the weight of the evidence.

Public Defender Assignment of Error No. 4: "YAQUB NUR WAS DENIED HIS FREEDOM WITHOUT DUE PROCESS OF LAW BY HIS CONVICTION WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

*Pro se* Assignment of Error No. 2: "THE CREDIBILITY OF THE STATES WITNESSES AND THE INCONSISTENCE OF THEIR TESTIMONY ON SEVERAL OCCASIONS UPON THESE A PREJUDICE EXISTED, AND THE TRIAL COURT SUBSEQUENT DECISIONS DEPRIVED

APPELLANT HIS DUE PROCESS RIGHT TO A FAIR AND IMPARTIAL TRIAL."

This court will not reverse a conviction where there is substantial evidence upon which a reasonable trier of fact might conclude that each essential element of the crime had been proved beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169. The weight of evidence and the credibility of witnesses are matters left primarily in the hands of the jury. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230. When a conviction is challenged as being against the manifest weight of the evidence, this court thoroughly reviews the record and determines:

"* * * whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State* v. *Martin* (1983), 20 Ohio App. 3d 172, at 175 (citations omitted).

Murder is proscribed at R.C. 2903.02 as follows: "(A) No person shall purposely cause the death of another." In the instant case there was substantial evidence in the form of eyewitness and medical expert testimony, as set forth above, that appellant stabbed Shawn Pettis in the back and chest with a knife using enough force to leave hilt marks on his victim. Under these circumstances, we are unable to conclude that the jury clearly lost its way, or that there occurred a manifest miscarriage of justice. For this reason, appellant's assigned errors challenging the weight of the evidence are not well taken.

### V. TELFAIRE INSTRUCTION

The brief of the public defender argues in the second assignment of error that:

"YAQUB NUR WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BEFORE A JURY OF HIS PEERS, WHEN THE TRIAL COURT FAILED TO GIVE HIS REQUESTED JURY INSTRUCTION ON THE INHERENT UNRELIABILITY OF EYEWITNESS IDENTIFICATIONS."

Defense counsel submitted what is know as a *Telfaire* instruction on eye-witness identification. See, *U.S.* v. *Telfaire* (C.A. D.C. 1972), 469 F.2d 552. The trial court declined to include the entirely of such instruction in its charge to the jury, instead instructing in part as follows:

"Some things you may consider in weighing the testimony of an identifying witness are the capacity of the witness and the opportunity of the

witness to observe; the witness' degree of attention at the time he observed the Defendant; accuracy of the witness' prior description, whether the witness had occasion to observe Defendant in the past; the interval of time between the event and the identity; all surrounding circumstances under which the witness has identified the Defendant.

"If, after examining the testimony of the identification witnesses you are not convinced beyond a reasonable doubt that the Defendant is the offender, you must find the Defendant not guilty." (Tr 566-567).

In *State* v. *Guster* (1981), 66 Ohio St. 2d 266, the Ohio Supreme Court discussed *Telfaire, supra*, holding at syllabus that:

"A trial court is not required in all criminal cases to give a jury instruction on eyewitness identification where the identification of the defendant is the crucial issue in the case and is uncorroborated by other evidence. A trial court does not abuse its discretion in deciding that the factual issues do not require, and will not be assisted by, the requested instructions and that the issue of determining identity beyond a reasonable doubt is adequately covered by other instructions."

The Tenth District Court of Appeals expanded upon this discretionary nature of requested *Telfaire* instructions in the case of *State* v. *Coffman* (1984), 16 Ohio App. 3d 200:

"Where the eyewitness identification is not inherently unreliable or in need of further, specific instruction, and where the general instruction adequately covers the requirement that identity be established beyond a reasonable doubt, it is not an abuse of discretion for the trial court to refuse to give the jury a special instruction timely requested by defendant concerning eyewitness identification."

In the case *sub judice*, the reliability of the eyewitness testimony has already been discussed and established. The trial court's instruction, as set forth above, sufficiently apprised the jury that they must carefully analyze the eyewitness testimony and be satisfied, beyond a reasonable doubt, that appellant had not been misidentified. We find no abuse of discretion in the trial court's instruction on the element of identification, and so this assignment of error is not well taken.

## VI. JURY SELECTION

In his fourth assignment of error *pro se*, appellant contends:

"THE TRIAL COURT ERRED IN ITS SELECTION OF THE JURY IN VIOLATION OF THE SIXTH AMENDMENT."

Essentially, appellant claims that blacks were discriminatorily excluded from his jury.

This court held in *State* v. *Williams* (June 8, 1989), Cuyahoga App. No. 55490 that:

"In order to establish a prima facie case of purposeful discrimination in selection of the jury, the defendant-appellant must show, by reference to the record:

"(1) that he is a member of a cognizable racial group;

"(2) the prosecutor exercised peremptory challenges to remove members of defendant-appellant's race; and

"(3) the facts and circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the jury on account of their race."

*Batson* v. *Kentucky* (1986), 476 U.S. 79; *State* v. *Walker* (June 18, 1987), Cuyahoga App. No. 52391, unreported; *State* v. *Hull* (Mar. 19, 1987), Cuyahoga App. No. 51853, unreported.

Appellant herein has failed to establish a *prima facie* case with references to the record. Although the record does reveal that appellant is black, there is no evidence raising an inference that the prosecutor used his peremptory challenges to exclude potential jurors based on their race. Accordingly, appellant's fourth assignment of error *pro se* is not well taken.

## VII. CAUSE OF DEATH

In the fifth assignment of error *pro se*, appellant contends:

"AN ACCUSED IS IMPROPERLY INDICTED, THE APPELLANT WAS CONVICTED FOR MURDER IN THE DEATH OF THE VICTIM WHEN THE EVIDENCE AT TRIAL PROVES THAT THE VICTIM DIED OF BILATERAL PNEMONIA (SIC), AS SUCH THIS CONVICTION IS UNCONSTITUTIONAL."

Basically, appellant argues that Shawn Pettis died of pneumonia rather than stab wounds.

The coroner's report in the instant case, admitted into evidence and part of the record on appeal, states in part:

"*CAUSE OF DEATH*: BILATERAL BRONCHOPNEUMONIA *due to* multiple (2) STAB WOUNDS OF CHEST WITH PERFORATION OF HEART."

"HOMICIDE." State's Exhibit 1. (Emphasis in original).

The coroner's testimony at trial further clarified that the proximate cause of Shawn Pettis' death was multiple stab wounds, not pneumonia. Appellant's contention is not supported by the record, and this assignment of error is not well taken.

### VIII.

In his sixth and final assignment of error *pro se*, appellant argues:

"THE APPELLANT IS DEPRIVED OF DUE PROCESS IN VIOLATION TITLED (29) A MOTION FOR DISCOVERY WAS MADE BY THE DEFENSE COUNSEL, YET THE PROSECUTOR WITHHELD A KEY CHAIN POUCH WHICH WOULD HAVE PLAINLY SHOWN THAT A THREE TO FOUR INCH KNIFE WOULD NOT FIT INTO IT."

While there was evidence on the record that the sheath confiscated from appellant by police at the scene of the crime had been misplaced during the early stages of trial, the record is clear that it was later discovered and used by defense counsel in the presentation of its case-in-chief. Joint Exhibit 2. During appellant's own direct examination, defense counsel questioned appellant concerning the sheath, which was shown to the jury. The prosecutor then cross-examined appellant thereon.

Appellant has not demonstrated any prejudice in this regard. Appellant's sixth assignment of error *pro se* is, therefore, not well taken.

### IX. CUMULATIVE ERROR

Finally, the public defender argues in its fifth and final assignment of error that:

"YAQUB NUR WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF THE SEVERAL ERRORS WHICH OCCURRED DURING HIS TRIAL."

Appellant cites the case of *State* v. *DeMarco* (1987), 31 Ohio St. 3d 191, for the proposition that while error in the admission of evidence, considered singularly, may not amount to reversible prejudice, the accumulation of several such errors may mandate reversal. *Id.* at paragraph 2 of syllabus. The Public Defender refers only to his previous assignments of error in this regard.

Upon careful review of the record, it is clear that the above-stated principle is not applicable to the instant case. Appellant received a fair trial, and there occurred no reversible error. This assignment of error is not well taken.

*Judgment affirmed.*

PATTON, C.J. and NAHRA, J., concur.