OPINION
Angelo Woodruff is appealing the judgment of the Montgomery County Common Pleas Court which convicted him of four counts of forcible rape, two counts of robbery, one count of abduction, and one count of felonious assault and determined that he was a sexually violent offender and sexual predator.
In the early evening of August 23, 1998, E. C.[1] joined some friends at the D Inn for a barbeque. E. C. had on her person in excess of $57 and several gold rings. Between 10:15 p.m. and 10:45 p.m., E. C. started walking home, but crossed the street to speak with an acquaintance. While speaking with her acquaintance, E. C. noticed Mr. Woodruff and believed him to be a friend of her acquaintance. Mr. Woodruff spoke with E. C. and attempted to show her a picture of his nephew. Suddenly, Mr. Woodruff grabbed E. C. and struck her in the head with a metal object, a blow which was so severe it rendered her unconscious.
E. C. regained consciousness only to find herself on the floor of a strange apartment being raped and choked by Mr. Woodruff. E. C. asked Mr. Woodruff, "Why are you doing this to me?" to which Mr. Woodruff responded that he would not kill her if she let him finish. However, Mr. Woodruff continued to choke E. C. until she again lost consciousness. When E. C. awoke she was lying on the floor and heard water running in the bathroom; she quickly ran out the door and began knocking on doors for help. Police officers arrived at 2:15 a.m. and found E. C. badly beaten. E. C. was taken to the hospital where she remained for several days. In the hospital, E. C. drifted in and out of consciousness and complained of severe pain. E. C. had bruises, a black eye, broken and missing teeth, a fractured cheekbone, a torn cervix, a bruised vagina, internal and external abrasions, and a broken jaw. For her jaw, E. C. had to undergo surgery in which doctors had to insert a metal plate and then wire E. C.'s jaw shut for nearly two months.
While in the hospital E. C. realized that her money, lighter, watch and rings were missing. Fortunately, E. C. had been able to get a close look at Mr. Woodruff and described him as a young white male, 5'5", 165 pounds, with long straight, brown hair. Additionally, she noticed that he had a speech impediment.
On August 25, 1998, at about 2:00 a.m., A. C., who was used to working the third shift, decided to go out for a drink. A. C. first went to a bar called Stowaways, but the drink was too strong so A. C. left for Oneys bar. A. C. only stayed at Oneys briefly as a fight broke out and she decided to return home.
While walking out to her car, which was parked between Oneys and the Duck Inn, A. C. was approached by Mr. Woodruff, who asked for a ride. Upon seeing A. C.'s hesitation, Mr. Woodruff assured her that he would not hurt her. Believing that he was also leaving because of the fight, A. C. agreed. A. C. followed Mr. Woodruff's directions and to her surprise found that they had gone in a circle, ending up at the apartments across the street from the bar. Mr. Woodruff asked her into the apartment, but she said no. Mr. Woodruff then asked her to go have breakfast with him at Denny's restaurant to which she agreed. However, Mr. Woodruff claimed that he needed to get money from the apartment and made excuses to get her into the apartment. Finally, A. C. agreed to accompany him inside. When she asked him his name, he said, "Angelo Woodruff."
When they returned to her car, A. C. stated that she needed to go home and check on her cats. Therefore, they drove to her apartment. A. C. asked that he remain in the car but Mr. Woodruff came into her home regardless. Fearful that he might steal something, A. C. quickly left with him. However, rather than proceeding to Denny's, Mr. Woodruff insisted that they return to his apartment because he need to retrieve more money. Again, they debated whether A. C. should accompany him inside and finally, A.C. agreed.
Once inside, A. C. went to the bathroom. When she came out of the bathroom, Mr. Woodruff attempted to kiss her and placed his hand between her legs. A. C. said no and pushed Mr. Woodruff away. Mr. Woodruff, now angry, locked the door and pulled A.C. into the bedroom and onto the mattress. A. C. attempted twice to shove Mr. Woodruff off her and get up, but each time he pushed her back down and jumped on her. Mr. Woodruff told her that he was going to rape and kill her and then he started choking her. A.C. could not breathe and lost consciousness.
When A. C. regained consciousness, Mr. Woodruff was still on top of her and they wrestled until Mr. Woodruff pinned her face down over the mattress, nearly suffocating her. Mr. Woodruff pressed what he claimed to be a gun into her back and ordered her to unbutton her pants and cooperate or he would kill her. Mr. Woodruff, then, pulled off her pants and A. C. felt him take $127 from her pocket. Mr. Woodruff proceeded to repeatedly rape A. C. vaginally, anally, and orally. Mr. Woodruff told A. C. that he ejaculated onto the bed so that there would be no evidence to prosecute him.
Suddenly, Mr. Woodruff became apologetic, crying, and asking A. C. to go to Florida with him. Mr. Woodruff stated that because A. C. had cooperated, he had not been forced to hit her like he had the others. Mr. Woodruff forced A. C. into her car as he drove to Englewood, where he got out and told A. C. she could leave. However, Mr. Woodruff told her that if she did not wait at least five days before telling anyone, he or one of his biker friends would fire five bullets into her back. A. C. fled and that evening went to the hospital. A.C. was severely injured including pain in her vaginal and anal areas, bruising, redness on her lower back, and a bump on her head. At the hospital, A. C. described to the police her attacker as about 5'5", 150-165 pounds, with long blondish-brown hair, and a mustache. A. C. relayed that he bragged of having several scars and had a noticeable speech impediment. A. C. told the detective that her attacker had said his name was, "Angelo Wood-something." Both E. C. and A. C. were able to identify Mr. Woodruff as their attacker from a photo spread and were able to identify the apartment as the site of the attack.
The police found no physical evidence linking Mr. Woodruff to the rapes. However, when a detective interviewed Mr. Woodruff one of the first questions out of his mouth "Was there anything found in the women, such as semen?" and "[W]ouldn't it {sic} have to be evidence of semen before a person is charged with rape?"
While Mr. Woodruff was incarcerated charged with these crimes, he made comments to a fellow prisoner, Mr. Estepp. Mr. Woodruff bragged about raping and robbing A. C., providing several of the details surrounding the crime. Additionally, Mr. Woodruff bragged about raping a woman he called by a nickname (hereinafter we will use the fictitious nickname "Rose"), but the description of this woman and details of the crime matched E. C.'s attack. Also, Mr. Woodruff bragged that the police would not be able to find any evidence against him because he had ejaculated into his hand.
In July of 1999, a jury found Mr. Woodruff guilty of four counts of forcible rape, one count of abduction, two counts of robbery, and one count of felonious assault. On July 18, 2000, the trial court determined that Mr. Woodruff was a sexually violent offender and a sexual predator. On January 22, 2000, Mr. Woodruff was sentenced to concurrent mandatory terms of ten years to life on the first three counts of rape, a consecutive sentence of ten years to life on the fourth count of rape, a five year consecutive sentence for abduction, eight year sentences for each of the robberies to be served concurrent to each other but consecutive to the other sentences, and eight years to life for felonious assault, which was to be served consecutive to the other sentences. On February 4, 2000, Mr. Woodruff filed a timely notice of appeal to this court.
Mr. Woodruff asserts the following assignments of error:
 1. MR. WOODRUFF WAS DENIED DUE PROCESS OF LAW UNDER THE OHIO AND UNITED STATES CONSTITUTIONS AS HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN HIS DEFENSE.
 2. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THE TESTIMONY OF DETECTIVE DUNSKY REGARDING THE LIKELIHOOD OF FINDING ANY PHYSICAL EVIDENCE AT A CRIME SCENE.
 3. THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR A NEW TRIAL ON THE BASIS OF JUROR MISCONDUCT.
 4. THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION OF ACQUITTAL ON COUNT SEVEN OF THE OCTOBER 6, 1998 INDICTMENT.
I. Appellant's first assignment of error:
Mr. Woodruff asserts that his counsel was ineffective in various manners at his trial and thus his conviction should be reversed. We disagree.
In order to prevail on a claim of ineffective assistance of counsel, the appellant must demonstrate (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." State v. Bradley (1989), 42 Ohio St.3d 136, certiorari denied (1990), 497 U.S. 1011; see, also, State v. Jackson (1980), 64 Ohio St.2d 107, 18 O.O.3d 348. The appellant has the burden to prove both prongs of the test as a licensed attorney in Ohio is presumed competent. Jackson, supra.
a. severance
Mr. Woodruff argues that his counsel was ineffective by failing to file a motion to sever the counts relating to A. C. from those relating to E. C. We disagree.
The law favors joinder of multiple criminal offenses in a single trial under Crim.R. 8(A). State v. Williams (1995), 73 Ohio St.3d 153,157-158, certiorari denied (1996), 116 S.Ct. 1047, reconsideration denied (1995), 74 Ohio St.3d 1409, citing State v. Franklin (1991),62 Ohio St.3d 118, 122; see, also, State v. Torres (1981),66 Ohio St.2d 340, 343, 20 O.O.3d 313. A defendant may only move to sever counts under Crim. R. 14 if he can show actual prejudice from the joinder of the counts. State v. Lott (1990), 51 Ohio St.3d 160, 163. The state can counter the allegations of prejudice by either demonstrating that the state could introduce evidence of one offense at the trial of the other or that the evidence of each crime is simple and direct. Williams, supra.
An exception to the general rule of evidence that a defendant's prior bad conduct is inadmissible to prove the conduct at issue is provided in Evid. R. 404(B), which states:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Evid. R. 404(B).
The Ohio legislature has limited evidence of the accused other acts in rape cases to those permitted by R.C. 2945.59, which provides:
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
R.C. 2945.59, R.C. 2907.02. The Ohio Supreme Court has held that even though R.C. 2945.59 does not state that other acts may be admitted to prove defendant's identity, it is included within the concept of scheme, plan, or system. State v. Shedrick (1991), 61 Ohio St.3d 331, 337 citing State v. Broom (1988), 40 Ohio St.3d 277, 281, State v. Curry (1975),43 Ohio St.2d 66, 72 O.O.2d 37. In order for the evidence of the other act to be admissible, it need not be similar to the crime charged but must tend to show by substantial proof, the defendant's identity, plan, scheme, or system. Shedrick, supra. The Ohio Supreme Court has stated that the other acts evidence can tend to show the identity of the defendant as the perpetrator by showing he "committed similar crimes within a period of time reasonably near to the offense on trial, and that a similar scheme, plan or system was utilized to commit both the offense at issue and the other crimes." Curry, supra.
In the instant action, Mr. Woodruff argues that the evidence of A. C.'s attack would not have been admissible in a separate trial for the attack on E. C. Thus, Mr. Woodruff argues that he was prejudiced by the joinder of the cases because, if severed, he would have been acquitted of the attack on E. C. if the jury had not heard the details on A. C.'s attack. We disagree. The evidence of the attack on A. C. would have been admissible against Mr. Woodruff in a trial for the attack of E. C. and the evidence on the attack against E. C. alone was sufficient that Mr. Woodruff would have still been convicted of the crime.
The similarities between the cases supports the State of Ohio's (hereinafter "State") argument that Mr. Woodruff had a scheme or plan for accosting, raping, and robbing women. For example, both A. C. and E. C. were approached in the area surrounding two bars next door to each other and across the street from Mr. Woodruff's apartment. Both of the victims were taken to Mr. Woodruff's apartment where they were strangled, raped, and robbed. Although E. C. was beaten severely while A. C. was not, Mr. Woodruff told A. C. that he had to beat the other women he had raped but had not beaten her because she had "cooperated." Additionally, the crimes occurred only one day apart from each other. This similarity in the scheme, plan, or system of the attacker tends to show that the same person has committed both crimes. Mr. Woodruff admits in his reply brief that identity is material in this case and as the Ohio Supreme Court has stated in Shedrick, evidence of a similar scheme or plan can be utilized to prove identity. Therefore, the evidence of the attack on A. C. would be admissible against Mr. Woodruff in a separate trial for the attack on E. C. Therefore, a motion to sever the counts against the different victims would not have succeeded and Mr. Woodruff's counsel was not ineffective for failing to file such a motion.
Additionally, even if the evidence of A. C.'s attack would not have been admissible at a separate trial for the attack on E. C., the evidence was sufficient against Mr. Woodruff for the attack of E. C. that the outcome would not have been different. E. C. testified in detail as to events of the night she was beaten, strangled, raped, and robbed. E. C. testified that she chose Mr. Woodruff out of a photo spread and in addition identified Mr. Woodruff in court as her attacker. E. C. also identified the apartment of Mr. Woodruff as the location where she was attacked. Additionally, the injuries E. C. sustained were consistent with her account of the events. Moreover, Mr. Woodruff bragged while in prison charged with E. C.'s rape that he raped a woman he called "Rose", who he severely beat with a pistol. The description of the crime and the victim distinctly matched E. C. This evidence was sufficient to support Mr. Woodruff's conviction and Mr. Woodruff cannot show that the outcome would have been different if his counsel had made a motion to sever.
b. expert testimony:
Mr. Woodruff argues that his counsel was ineffective for failing to object to statements by three expert witnesses who testified that it was not unusual to not find physical evidence in cases similar to these. We disagree.
Evid. R. 703 states:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.
Evid. R. 705 provides:
 The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.
Additionally, Evid. R. 702 permits expert testimony in situations where "the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue." State v. Boston (1989),46 Ohio St.3d 108, 118.
Mr. Woodruff argues that his counsel failed to object when three of the State's expert witnesses testified that in their own personal experience it was not unusual to have no physical evidence. The State's expert on fingerprint comparison, Detective Cordle, testified that in all of the cases he has had he is only able to get a fingerprint in one to ten percent of the cases. The State's expert on trace evidence, Mr. Bibby, testified that in his personal experience only less than ten to fifteen percent of the time will head or pubic hair be found mixed in another's hair. The State's expert in forensic serology, Ms. Davis, studied the sexual assault kits on the victims and testified that thirty to forty percent of the sexual assault cases she works do not have semen present. These expert witnesses offered statistical evidence based on their own experience rather than opinions. This evidence was admissible under Evid. R. 702(A) because it related to matters beyond the knowledge or experience possessed by lay persons. The average juror does not know the frequency with which physical evidence is found and therefore has no means to determine how much importance to place on the absence of the physical evidence. Thus, the testimony was admissible under the rules of evidence.
Additionally, we do not find that if counsel had objected to these statements, the outcome of the trial would have been different. The State had sufficient evidence to convict Mr. Woodruff without these statements. Thus, Mr. Woodruff cannot show that the outcome of the trial would have been different without these statements. Mr. Woodruff's counsel was not ineffective because he failed to object to this minor testimony.
c. prosecutorial misconduct:
Mr. Woodruff argues that the prosecutor made statements in her closing arguments which were improper and his counsel was ineffective for failing to object to these statements. We disagree.
In a closing argument, a prosecutor may properly comment on any evidence which is presented at trial. State v. Stephens (1970),24 Ohio St.2d 76, 82, 53 O.O.2d 182. However, the prosecutor must confine his closing argument to evidence presented at trial and not comment on "considerations extraneous to guilt or innocence." State v. Miller (Sept. 22, 2000), Montgomery App. No. 18011, unreported (finding that the prosecutor's comments urging the jury not to let the defendant get away with his crime was not based on evidence presented at the trial). In a trial, the prosecution has wide latitude in its closing argument "as to what the evidence has shown and what reasonable inferences may be drawn therefrom." Stephens, supra.
At Mr. Woodruff's trial, the prosecutor in the rebuttal portion of her closing argument stated:
 This defendant thinks he's clever. This defendant thinks he knows how to beat the system because if he doesn't ejaculate, if he doesn't leave semen, then you can't prove him guilty. He tells [A. C.] that. The first thing, practically, out of his mouth with Detective Ison was if you don't have semen in them, how are you going to charge somebody with rape. Don't you need semen to charge somebody with rape?
 He thinks he is clever. He thinks he is smart. He thinks he has got the system nailed. Well, he is not that smart. The evidence is there. And the evidence is the injuries those two women received. Their testimony and their identification of that defendant. That is evidence of these crimes.
(Tr. 1009-1010) (emphasis added).
Mr. Woodruff objects to the italicized portion of the prosecutor's statement as improper, like Miller. However, in this case, unlike Miller, evidence was presented to the jury of Mr. Woodruff's attempt to avoid prosecution and convictions for raping these women by refusing to ejaculate into the women. Mr. Woodruff made statements to A. C. and Mr. Estepp that he ejaculated either into his hand or on the bed to avoid being convicted for raping these women. The prosecutor in this case was fairly commenting on this evidence to the jury in her closing argument and it was not improper. Thus, Mr. Woodruff's counsel was not ineffective for failing to object to it.
Additionally, Mr. Woodruff argues his counsel was ineffective for failing to object when the prosecutor improperly stated to the jury that "Rose," of whom Mr. Woodruff bragged of raping to Mr. Estepp, was E. C. The evidence provided in the testimony of Mr. Estepp, the victims, and the detectives support the inference that "Rose" was E. C. E. C. matched the physical description Mr. Woodruff provided of "Rose." The details of E. C.'s attack match those Mr. Woodruff described in his rape of "Rose." Further, the timing of the "Rose" rape and E. C.'s rape coincide. Finally, when Mr. Woodruff was bragging of raping A. C. and "Rose" he was in prison charged with raping A. C. and E. C. Thus, its likely Mr. Woodruff was talking about raping E. C., rather than admitting to a third rape. Therefore, the prosecutor's statement was a fair and proper comment and valid inference from this evidence. Thus, Mr. Woodruff's counsel was not ineffective for failing to object to this statement by the prosecutor since the statement was proper. Additionally, the outcome of the trial would not have been different if Mr. Woodruff's counsel had objected to the prosecutor's statements. Mr. Woodruff's due process rights were not violated by ineffective assistance of counsel.
d. jury instructions:
Mr. Woodruff argues that his counsel was ineffective for failing to request the Telfaire jury instruction. We disagree.
In order to prevail on a claim of ineffective assistance of counsel for the failure to request a jury instruction, one must show that but for the counsel's error in failing to request the jury instruction, the result of the proceeding would have been different. Bradley, supra; see, also, State v. Blackburn, (Aug. 28, 1998), Greene App. No. 97 CA 100, unreported. The "Telfaire" jury instruction derives from the court in United States v. Telfaire, (C.A.D.C. 1972), 469 F.2d 552, and "cautions the jury of the potential unreliability of eyewitness testimony." Blackburn, supra. In Blackburn, supra, this court determined that a counsel is not ineffective for failing to request a Telfaire instruction where a weak eyewitness identification is corroborated by another witness's identification of the defendant as the assailant in a similar crime a month later and the defendant's admissions.
Similarly, Mr. Woodruff maintains that the Telfaire instruction needed to be given and his counsel was ineffective in failing to request it. In the instant case, the Telfaire instruction would not be necessary for A. C. as she spent in excess of five hours with Mr. Woodruff the night he attacked her. Additionally, he told her his name and she chose him out of a legitimate photo spread shortly after the attack. As in Blackburn, A. C.'s identification supports E. C.'s identification as the crimes occurred only one day apart and demonstrated a similar plan or scheme by Mr. Woodruff to rape and rob women. Further, like Blackburn, Mr. Woodruff's admissions to A. C. and Mr. Estepp bolster the identification of the witnesses. Therefore even assuming that the trial court would have given the Telfaire instruction if requested, there was no reasonable probability that the result of the trial would have been different. Thus, Mr. Woodruff's counsel was not ineffective by failing to request a Telfaire instruction.
e. motion to suppress:
Mr. Woodruff argues that his counsel was ineffective for failing to have the court hold a hearing and rule on his previously filed motion to suppress. We disagree.
One may presume "that the trial court has overruled any pretrial motion which it fails to rule upon." State v. Boehm, (Dec. 31, 1997), Montgomery App. No. 16335, unreported, appeal dismissed (1998),81 Ohio St.3d 1513, citing State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn. (1994), 69 Ohio St.3d 217.
Mr. Woodruff filed a motion to suppress on December 17, 1998. However, Mr. Woodruff failed to ever bring to the court's attention the fact that the motion to suppress was pending. It is this failure that Mr. Woodruff asserts amounted to ineffective assistance of counsel. Yet, Mr. Woodruff fails in either of his appellate briefs to point to any admissibility problems with either the witness identifications or the statements. Also, the trial testimony did not point to any admissibility problems with the identifications or the statements. Therefore, there was no reasonable probability that the result of the trial would have been different if Mr. Woodruff's trial counsel had caused the trial court to hold a hearing on the motion to suppress. Thus, Mr. Woodruff's counsel was not ineffective for failing to cause a hearing to be held on the motion to suppress.
Mr. Woodruff `s trial counsel was not ineffective and did not deny him due process of law. The Appellant's first assignment of error is without merit and overruled.
II. Appellant's second assignment of error:
Mr. Woodruff argues that the trial court abused its discretion in admitting over defense objection Detective Dunsky's testimony on the likelihood of finding physical evidence in his cases. We disagree.
An abuse of discretion amounts to more than a mere error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151, 157. In order to prove an abuse of discretion, the trial court's conduct must demonstrate an attitude that is unreasonable, arbitrary, or unconscionable. Id. Under Evid. R. 702(A), expert testimony which "relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons" is admissible. In State v. Korecky, the Tenth District Court of Appeals permitted a doctor to testify based on his own experience that it is not unusual to find no physical evidence in cases of alleged abuse. (June 13, 1995), Franklin App. No. 94APA10-1505, 94APA10-1506, unreported.
Here, Detective Dunsky testified that in his personal experience it is not unusual for no physical evidence to exist linking a particular person to a case. We find this similar to Korecky, an expert testifies based on his own experience as to the frequency of physical evidence in his cases. Additionally, this counters the common misconception among lay persons that physical evidence should be found for every crime, as is frequently shown on police television shows. Thus, when the defense stressed the lack of physical evidence, this testimony clarified for the jury that physical evidence is not necessary to support a conviction. Therefore, we cannot find that the trial court's decision to admit this testimony over objection demonstrated an attitude that was unreasonable, arbitrary, or unconscionable. The appellant's second assignment of error is without merit and overruled.
III. Appellant's third assignment of error:
Mr. Woodruff argues that the trial court abused its discretion in overruling the defense motion for a mistrial based on juror misconduct. We disagree.
A trial court's ruling on a motion for a mistrial due to juror misconduct will not be reversed absent a showing that the trial court abused its discretion. State v. Stallings (2000), 89 Ohio St.3d 280,296; State v. Dennis (1997), 79 Ohio St.3d 421, 437. As stated above, a trial court only will be found to have abused its discretion when its conduct demonstrates an attitude which is unreasonable, arbitrary, or unconscionable. Adams, supra. When reviewing an incident of alleged juror misconduct, the trial court must determine (1) whether juror misconduct occurred, and if so, (2) whether the misconduct materially affected the defendant's substantive rights. State v. Hopfer (1996),112 Ohio App.3d 521, 543, citing State v. Taylor (1991),73 Ohio App.3d 827, 833. The Ohio Supreme Court has stated, "[a] trial court enjoys broad discretion in determining a juror's ability to be impartial." Dennis, supra.
During Mr. Woodruff's trial, it came to the court's attention that the father of a fourteen year old girl, who alleged that Mr. Woodruff had raped her ten years ago, may have informed a juror about that incident. The trial court spoke with the fourteen year old girl and her mother and impressed upon them the importance of determining who the juror was, what he might know, and if he had stated anything to the other jurors. The fourteen year old girl told the trial court that her father, who is a roofer, told her that he was putting a new roof on the home of a man called for jury duty in this case and that he told the prospective juror that Mr. Woodruff had raped his daughter when she was four. Neither the fourteen year old girl nor her mother knew the name of the prospective juror or knew a direct way to contact the girl's father. Attempting to provide the court with a way to reach the fourteen year old's father, the women gave the court the phone number of his girlfriend. The trial court further admonished the women that they were not to discuss the previous rape in the courtroom or have any contact with the jurors.
The judge then spoke to the jurors asking if any of them had a new roof installed within the past week and only Mr. Hopson had. Mr. Hopson acknowledged that he had spoken to the fourteen year old girl's father, but that he had not told any of his fellow jurors about the conversation. The trial court further questioned Mr. Hopson outside of the presence of the remainder of the jurors. Mr. Hopson stated that his roofers knew that he was on jury duty and the fourteen year old girl's father asked him about the trial. Mr. Hopson stated that the roofer told him that Mr. Woodruff had molested someone in his family. Mr. Hopson stated that he did not tell any of his fellow jurors about the conversation nor did he indicate that he had heard Mr. Woodruff's name before. Mr. Hopson was excused from the jury.
The prosecutor and the judge believed that Mr. Hopson had not told any of the other jurors and thus that the remaining jurors had no idea about the young girl or her father. The judge felt that if Mr. Hopson had wanted to lie he would have denied having a conversation with the girl's father. The judge was also satisfied that Mr. Hopson had not told his fellow juror's because of the blank looks they had when she inquired of them to determine with whom the young girl's father had spoken.
The defense moved for a mistrial, arguing that a conspiracy existed to taint Mr. Woodruff's jury and deny him a fair trial. The judge denied this conspiracy theory and instead believed it to be an "amazingly unfortunate set of coincidences" and that the jury was not tainted. (Tr. 363). The trial court replaced Mr. Hopson with an alternate juror and more strongly admonished the jury not to discuss the case with anyone.
In this case, the State does not contest that there was juror misconduct. However, the State argues that the misconduct did not violate Mr. Woodruff's substantive rights. There is no evidence that any juror other than Mr. Hopson was aware of the information regarding the fourteen year old girl. The trial court took sufficient actions. The judge questioned the jurors as a group and then specifically spoke with Mr. Hopson in greater detail. Additionally, when questioned as a group, the other jurors appeared to know nothing of the conversation. Thus, there is no reason to believe that the information Mr. Hopson received in any way affected the verdicts of the jurors who actually deliberated in this case. There is no evidence that the trial court in its decision not to order a mistrial for juror misconduct was arbitrary, unreasonable, or unconscionable. We find the trial court did not abuse its discretion. The appellant's third assignment of error is without merit and overruled.
IV. Appellant's fourth assignment of error:
Mr. Woodruff argues that the trial court erred in overruling his motion for an acquittal on count seven of the indictment, which was the robbery of E. C. We disagree.
R.C. 2911.01(A) provides, "[n]o person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." The mens rea element of theft requires a "purpose to deprive the owner of property," and that the defendant must "knowingly obtain or exert control" over the property. R.C. 2913.02. Construing the evidence in a light most favorable to the state, the trial court must determine whether "reasonable minds [could] reach different conclusions as to whether each element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978), 55 Ohio St.2d 261, 9 O.O.3d 401. Thus, an appellate court will only reverse a trial court's decision on a motion for acquittal if reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt. State v. Miley (1996), 114 Ohio App.3d 738, 742; see, also, State v. White (1989), 65 Ohio App.3d 564, 568; State v. Jenks (1991), 61 Ohio St.3d 259.
E. C. testified that prior to her attack she had in excess of $57 in her pocket, a lighter, a watch, and three rings on her fingers. During her attack, E. C. was severely beaten by her attacker, causing her to be unconscious for much of the attack. Later, at the hospital, while getting treatment for the attack, she realized these items were gone. E. C. did not recall the items being taken from her person. Also, contrary to the assertion in the State's brief, Mr. Estepp did not testify at trial that Mr. Woodruff admitted robbing E. C. Thus, the only evidence of E. C.'s robbery is her testimony.
Mr. Woodruff asserts that there was insufficient evidence of the intent to deprive E. C. of her property — the mens rea element of the crime. He asserts that the items could have fallen off in the physical struggle which occurred between E. C. and her attacker. However, it is unlikely that three gold rings on E. C.'s fingers, over $57 in her pocket, her lighter, and her watch on her wrist would all simply "fall" off. Although the evidence of Mr. Woodruff's robbery of E. C. is not strong, we cannot say a reasonable juror could only conclude that the State failed to prove beyond a reasonable doubt that Mr. Woodruff purposefully deprived E. C. of her property. Therefore the trial court did not err in overruling Mr. Woodruff's Crim. R. 29 motion for acquittal. The fourth assignment of error is without merit and overruled.
WOLFF, P.J. and FAIN, J., concur.
[1] Consistent with a policy adopted by this court, we refrain from identifying victims of sexual crimes by their names.