**UNITED STATES of America**

v.

**Melvin TELFAIRE, Appellant.**

**No. 24688.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1971.

Decided June 19, 1972.

Mr. Andrew L. Frey, Washington, D. C. (appointed by this Court), for appellant. Mr. Robert M. Beckman, Wash-

ington, D. C. (appointed by this Court), was on the brief for appellant.

Mr. Barry W. Levine, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and John S. Ransom, Asst. U. S. Attys. were on the brief, for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and ADAMS,[*] Circuit Judge, United States Court of Appeals for the Third Circuit.

PER CURIAM:

Appellant was found guilty of robbery, D.C.Code § 22–2901, and sentenced under the Youth Corrections Act. On this appeal it is contended the judge erred (1) in sending the case to the jury on the uncorroborated testimony of a single witness; (2) in failing to initiate a special instruction on identification even in the absence of request by defense counsel, and (3) in failing to give an instruction on the absence of flight. We affirm.

## I.

Anglo-American jurisprudence has accepted the "one witness" rule, declining to follow the rule of the canon and civil law requiring a greater number of witnesses or corroboration,[1] with exceptions requiring corroboration for particular crimes, notably "sex" offenses, where the urge to fantacize or motive to fabricate makes the risk of unjust conviction high.[2]

The one witness rule recognizes that certain crimes are solitary, and as to such crimes both the deterrence of punishment and the rehabilitation of offenders are proper concerns of the state. Moreover, Anglo-American jurisprudence—with its strong presumption of innocence, and adversary system—has safeguards which dilute the danger of conviction of the innocent, a problem that concerns every civilized system of justice.

■ ■ With retention of the one-witness rule, which is plainly applicable to the crime of robbery,[3] the evidence in this case—set forth in the footnote [4]—

---

[*] Sitting by designation pursuant to 28 U.S. C. § 291(a) (1970).

1. The history of this development is extensively related in 7 Wigmore, Evidence §§ 2030–34 (1940).

2. Coltrane v. United States, 135 U.S.App. D.C. 295, 299, 418 F.2d 1131, 1135 (1969).

3. Thompson v. United States, 88 U.S. App.D.C. 235, 188 F.2d 652 (1951); Jones v. United States, 124 U.S.App.D.C. 83, 361 F.2d 537 (1966).

4. Mr. Peregory, the complaining witness, testified that on the evening of April 10th he was trying to "hunt up" a friend named Edwards with whom he and his wife had once lived at 16th and Irving Streets. Mr. Peregory testified that he "walked up 10th Street and looked in this hotel." While standing there, a man and a woman approached him and inquired if he was looking for narcotics. He indicated that he was not, but rather was trying to locate his friend Edwards. The man and woman stated they knew Edwards and that he had a room on the third floor of the hotel, whereupon the three of them went to the third floor. Upon reaching

that floor, they were joined by a third person, later identified as appellant. Mr. Peregory testified that appellant asked him for a dollar and that he complied with appellant's request. Asked for more money, Mr. Peregory insisted that he had none, but his pockets were searched and a ten dollar bill was removed by appellant. The third floor area where these events took place was, according to Mr. Peregory, not well lighted.

The complaining witness then left the hotel and walked directly to 10th and New York Avenue where he encountered a uniformed police officer to whom he recounted the robbery, though giving the police no description of his assailants. By his own testimony, it took him approximately one-half hour to make this two block trip. Two plainclothes officers then accompanied him back to the hotel. Upon entering, Mr. Peregory immediately identified appellant, who was standing in the lobby, as one of the persons who had robbed him. At the time of his arrest, appellant had four or five dollar bills and sixty or seventy cents in change.

Appellant took the stand in his own defense. He testified that he had arrived at the hotel about seven o'clock in the

while having some weak spots, is sufficient to preclude us from finding an abuse of discretion on the part of the trial judge in sending the case to the jury.[5]

## II.

The presumption of innocence that safeguards the common law system must be a premise that is realized in instruction and not merely a promise. In pursuance of that objective, we have pointed out the importance of and need for a special instruction on the key issue of identification, which emphasizes to the jury the need for finding that the circumstances of the identification are convincing beyond a reasonable doubt. This need was voiced in 1942 in McKen-

zie v. United States[6] and it has been given vitality in our opinions of recent years—following the Supreme Court's 1966 *Wade-Gilbert-Stovall* trilogy[7] focusing on the very real danger of mistaken identification as a threat to justice. We refer to our post-*Wade* opinions in *Gregory*[8] and *Macklin*.[9] These opinions sought to take into account the traditional recognition that identification testimony presents special problems of reliability[10] by stressing the importance of an identification instruction even in cases meeting the constitutional threshold of admissability.[11]

We do not qualify in any particular the importance of and need for a special identification instruction. But in evaluating the prejudice inherent in the fail-

---

evening and spent an hour talking in the fourth floor room of a friend. He then went down to the lobby where he talked for a few minutes with a young woman. At that point the police entered the hotel and he was arrested.

5. The usual standard for directing a verdict of acquittal, *see, e. g.,* Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), must of course be applied in the special context of a one-witness case where the only evidence is the victim's identification. Necessarily, the only issue is whether the circumstances surrounding the identification could be found convincing beyond a reasonable doubt. We think the Fourth Circuit, in United States v. Levi, 405 F.2d 380, 383 (1968), stated the correct approach:

[A] district judge has the power to refuse to permit a criminal case to go to the jury even though the single eye witness testifies in positive terms as to identity. . . . In deciding whether to permit a criminal case to go to the jury, where identification rests upon the testimony of one witness, the district judge ought to consider with respect to identification testimony the lapse of time between the occurrence of the crime and the first confrontation, the opportunity during the crime to identify . . . ., the reasons, if any, for failure to conduct a line-up or use similar techniques short of line-up, and the district judge's own appraisal of the capacity of the identifying witness to observe and remember facial and other features. In

short, the district judge should concern himself as to whether the totality of circumstances "give[s] rise to a very substantial likelihood of irreparable misidentification."

6. 75 U.S.App.D.C. 270, 126 F.2d 533.

7. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

8. Gregory v. United States, 125 U.S.App. D.C. 140, 369 F.2d 185 (1966). *See* Salley v. United States, 122 U.S.App.D.C. 359, 353 F.2d 897 (1965).

9. Macklin v. United States, 133 U.S.App. D.C. 139, 409 F.2d 174 (1969).

10. *E. g.,* P. Wall, Eye-Witness Identification in Criminal Cases 8–11 (1965); 3 Wigmore, Evidence § 786(a) (Chadbourn rev. 1970) (compendium of sources).

11. We think that now, after the Supreme Court has focused on identification problems in its 1967 *Wade-Gilbert-Stovall* trilogy, it is even more imperative that trial courts include, as a matter of routine, an identification instruction. In cases where identification is a major issue the judge should not rely on defense counsel to request so important a charge. Macklin v. United States, *supra* note 9, at 143, 409 F.2d at 178. The quoted language was held non-retroactive in United States v. Washington, 134 U.S.App. D.C. 135, 413 F.2d 409 (1969).

ure of the trial court to offer one, we have taken into account that in the circumstances of a particular case, the proof, contentions and general instructions may have so shaped the case as to convince us that in any real sense the minds of the jury were plainly focused on the need for finding the identification of the defendant as the offender proved beyond a reasonable doubt.[12]

■ In this case, as in *Macklin*, we consider the instructions given by the trial judge [13]—both the initial instructions on the burden of proving beyond a reasonable doubt all the elements of the offense, and the follow-on instructions dealing with the defense of alibi, and the problem of mistaken identity—and the overall context of the case, and we are satisfied that the attention of the jury was significantly focused on the issue of identity.

Moreover, this case exhibits none of the special difficulties often presented by identification testimony that would require additional information be given to the jury in order for us to repose confidence in their ability to evaluate the reliability of the identification.[14] Here the victim had an adequate opportunity to observe, and the testimony revealed a spontaneous identification of the defendant in the lobby of the hotel where the robbery took place as soon as the complainant entered the lobby with the police officers (see fn. 4). The absence

---

12. United States v. Shelvy, 148 U.S.App. D.C. 1, 458 F.2d 823 (1972); Macklin v. United States, *supra* note 9.

13. In order for you to find the defendant, Melvin Telfaire guilty of robbery, you must find that the Government has proved beyond a reasonable doubt the following:

That the defendant took property of some value from the complainant, Mr. Peregory, against the will of the complainant;

That the defendant took possession of such property by force or violence or stealthy seizure, snatching, or putting the complainant in fear;

That the defendant took possession of such property from the person or immediate actual possession of the complainant;

That, after having so taken the property, the defendant carried it away; and

That the defendant took such property and carried it away without the right to do so and with the specific intent to steal it.

＊　＊　＊　＊　＊

In this case the defendant has taken the stand and testified in his own defense with respect to what occurred on April 10, 1970. He admits that he was in the hotel. However, he states that he was on the fourth floor of the hotel and not on the third floor where the alleged offense took place. He denies that at any time he robbed or even saw the complainant.

His defense is in the nature of an alibi and I wish to give you the following instruction of law with respect to an alibi.

The claim of alibi is legitimate, legal and proper. The defendant may not be convicted of the offense with which he is charged unless the Government proves, beyond a reasonable doubt that the defendant was present at the time when, and at the place where, the offense was committed.

If, after full and fair consideration of all of the facts and circumstances in evidence you find that the government has failed to prove beyond a reasonable doubt that the defendant was present at the time when, and the place where, the offense charged was allegedly committed, you must find the defendant not guilty.

As I have indicated to you with respect to the particular offense, the Government has a burden of proving all of the essential elements of the offense with which the defendant is charged beyond a reasonable doubt.

When you retire to the jury room there are two possible verdicts that may be returned.

If you find the Government has proven beyond a reasonable doubt all of the essential elements of the crime of robbery as I have defined them to you, then you may find the defendant guilty under the indictment as charged.

If, on the other hand, you find that the Government has not proven beyond a reasonable doubt all of the essential elements of the crime of robbery as I have defined to you, then your verdict must be not guilty.

14. Compare the model special identification instruction contained in the appendix to this opinion.

of a special identification instruction did not prejudice appellant's defense.[15]

■ We do, however, consider our appellate function to require a supplement to our prior rulings. In *Macklin*, we called attention to a standard criminal jury instruction prepared in 1966 by the Junior Bar Section of the District of Columbia Bar Association. That instruction does little more than incorporate one sentence modeled on our 1942 opinion in *McKenzie*. It does not take note of the discussion in *Wade* and subsequent cases.

In Barber v. United States[16] the Third Circuit undertook to present an approach that would "recognize a compelling need for guidelines which will obviate skeletal pattern instructions and assure the essential particularity demanded by the facts surrounding each identification." To further the administration of justice in the District of Columbia the Appendix contains a model instruction, using material from *Barber* to some extent, which trial judges can use to focus on the identification issue— with revision and adaptation to suit the proof and contentions of a particular case. It is not being set forth in terms of compulsion, but a failure to use this model, with appropriate adaptations, would constitute a risk in future cases that should not be ignored unless there is strong reason in the particular case.

III.

■ Defense counsel requested an instruction, set forth in the footnote, on the absence of flight.[17] It is a paraphrase, with verbal reversal, of an instruction on the inference from flight which appears in the Junior Bar Section's standard instruction.[18] That flight instruction is one which we have criticized as weak and as relating to an "extraordinarily complex action, potentially prompted by a variety of motives other than guilt of the actual crime."[19] We have ruled that such an instruction may be used only "sparsely"[20] and only if the trial judge accompanies it with an indication of the variety of motives that may account for flight.

In this case, the trial judge, presented with what can fairly be described as a new "form" instruction—on the absence of flight—noted that this court has approached the "whole question of flight" with circumspection, and concluded that the instruction should not be given. The court ruled that counsel would be permitted to argue the concept to the jury.

15. *See* United States v. Shelvy, *supra* note 12.

16. United States v. Barber, 442 F.2d 517, 528 (3rd Cir. 1971). *See* United States v. Edward, 439 F.2d 150 (3rd Cir. 1971). *Barber* articulated a mandatory approach for prospective application only.

17. Appellant's requested instruction was submitted to the trial court in the following form:

There has been evidence that the defendant was arrested near the place of the alleged offense some minutes after the offense is alleged to have occurred. Absence of flight [or concealment] after a crime has been committed does not create a presumption of innocence. You may consider evidence of absence of flight [or concealment] however, as tending to prove the defendant's lack of consciousness of guilt. You should consider and weigh evidence of absence of flight [or concealment] by the defendant in connection with all the other evidence in the case and give it such weight as in your judgment it is fairly entitled to receive.

The bracketed language was omitted by appellant's counsel after the Government claimed that the testimony showed appellant had turned his back to the police.

18. Flight or concealment by the defendant, after a crime has been committed, does not create a presumption of guilt. You may consider evidence of flight or concealment, however, as tending to prove the defendant's consciousness of guilt. You are not required to do so. You should consider and weigh evidence of flight or concealment by the defendant in connection with all the other evidence in the case and give it such weight as in your judgment it is fairly entitled to receive.

19. Austin v. United States, 134 U.S.App. D.C. 259, 261, 414 F.2d 1155, 1157 (1969).

20. *Id.*

We approve the trial court's exercise of discretion. We need not consider what the situation would have been if defense trial counsel had presented an instruction that advised the jury that an inference might be drawn from the absence of flight, and at the same time advised the jury of different inferences which might also be drawn. While the inference from the absence of flight could properly be argued to the jury, we see no basis for requiring it to be elevated above any other inference that might be argued to the jury, and given the status of being particularly significant by being enshrined in an instruction. If anything, the interest of justice might better be served by removing entirely from instructions both flight and absence of flight, and relegating the entire subject to the give and take of argument.

Affirmed.

*Appendix: Model Special Instructions on Identification*

One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Government has the burden of providing identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

■ Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

In appraising the identification testimony of a witness, you should consider the following:

(1) Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?

■ Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past.

[In general, a witness bases any identification he makes on his perception through the use of his senses. Usually the witness identifies an offender by the sense of sight—but this is not necessarily so, and he may use other senses.] *

(2) Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account both the strength of the identification, and the circumstances under which the identification was made.

■ If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see defendant, as a factor bearing on the reliability of the identification.

[You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.]

[(3) You make take into account any occasions in which the witness failed to

---

* Sentence in brackets ([]) to be used only if appropriate. Instructions to be inserted or modified as appropriate to the proof and contentions.

make an identification of defendant, or made an identification that was inconsistent with his identification at trial:]

 (4) Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.

I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty.

BAZELON, Chief Judge, concurring:

I concur in the judgment that the trial court's error in failing to offer a *sua sponte* identification instruction as required by Macklin v. United States [1] was harmless. And I wholeheartedly concur in the promulgation of a model identification instruction which deals realistically with the shortcomings and trouble spots of the identification process. I have in the past repeatedly protested the practice of "turn[ing] over to the jury this critical question without even trying to acquaint it with the risks involved or the information now available that could illuminate its inquiry." [2] The model instruction we approve today goes far toward providing that illumination. But not far enough.

The available data, while not exhaustive, unanimously supports the widely held commonsense view that members of one race have greater difficulty in accurately identifying members of a different race.[3] The problem is by no means insubstantial; a significant percentage of the identifications in this jurisdiction are inter-racial. Yet, we have developed a reluctance—almost a taboo —to even admit the existence of the problem, let alone provide the jury with the information necessary to evaluate its impact.

This reluctance apparently grows out of a well-intentioned effort to insulate criminal trials from base appeals to racial prejudice. But I cannot agree that because any discussion of this identification problem necessarily refers to racial differences, such discussion is, as one New York appellate court has held, "prejudicial" and "divisive." [4] And it

1. 133 U.S.App.D.C. 139, 409 F.2d 174 (1969).

2. United States v. King, 149 U.S.App.D.C. 61 at 65, 461 F.2d 152 at 156 (1972) (Bazelon, C. J., concurring): United States v. Brown, Proctor & Williams, 148 U.S.App.D.C. 43 at 54 n. 1, 461 F.2d 134 at 145 n. 1 (1972) (Bazelon, C. J. dissenting).

3. *See* the sources referred to in my dissent in United States v. Brown, Proctor & Williams, *supra* note 2, at 54 n. 1, 461 F.2d at 145 n. 1. There are indications that at least some of the District Judges in this jurisdiction routinely treat the racial character of an identification as one of the factors bearing on its reliability. In considering the question of independent source, essentially an issue of reliability, a trial judge recently made the following analysis:

*The principal identifying witness, Mr. Williams is a Negro and so is the Defendant.* He had ample opportunity at close range, under good lighting conditions, to observe the Defendant. The Court, after observing his demeanor and his manner on the stand, and his answer to various questions, is satisfied with his manner on the stand, and his answers or not he had seen photographs, he would be able, as he did in Court today, to identify the Defendant as the man who stuck a gun at him in the hold-up.
Quoted in United States v. Thomas, 149 U.S.App.D.C. 368, at 369, 463 F.2d 314, at 315 (1972) (emphasis added).

4. *See* People v. Burris, 19 A.D.2d 557, 241 N.Y.S.2d 75 (2nd Dept. 1963) *relying on* People v. Hearns, 18 A.D.2d 922, 238 N.Y.S.2d 173 (2nd Dept. 1963).

certainly does not excuse the pretension that the problem does not exist. In any event, a narrowly drawn instruction dealing with a familiar, albeit racial, phenomenon can hardly be equated with a broad appeal to racial prejudice.

The admission in a criminal trial of any evidence is governed by the familiar tests of logical and legal relevancy. Proffered evidence will be excluded if it does not make the "existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." [5] And even if logically relevant, it will still be excluded "if its probative value is substantially outweighed by the danger of undue prejudice." [6] This excludes the classic appeal to racial prejudice: for example, the suggestion often made to a white jury that, if they fail to convict a black defendant charged with a crime of violence against another black, he and other blacks will be encouraged to commit similar crimes against whites.[7] Such racial fears do not bear on whether a crime was committed, and, if so, whether the defendant committed it. Its only use could be to obtain a conviction on naked racism.

None of these problems are raised simply by recognizing the danger that inter-racial identifications may be more unreliable. That danger is plainly relevant to the accuracy of an identification, just as are the lighting conditions at the time of the offense, or the distance from which the subject was viewed. And it is certainly not "prejudicial" in the traditional sense of encouraging "decision on an improper basis." [8]

No appeal is made to decide guilt on the basis of race. That the identifying witness and the defendant are of different races is simply one of the factors to be considered in determining the central issue—the accuracy of the identification.[9] Indeed, the jury will see with its own eyes when an identification is inter-racial. Explicit instruction restricting consideration of this fact solely to the issue of identification is an important safeguard against any other and unwarranted use of race by the jury.

Nor is anything added by labelling the mere mention of this identification problem "divisive." It is hardly "divisive" to point out that racial divisions not only exist, but may have an operative, though unintentional, effect on the determination of a defendant's guilt. I do not know if there can be any circumstances which would justify the fiction that these divisions do not exist. But I do know that a criminal trial is not any of them. The quest there is for truth, not reassurance.

It follows that counsel should be allowed to urge the jury to consider whether the inter-racial character of an identification affects its reliability. I also believe that when the issue is raised, the jury should be *instructed* to consider the matter. The jury's knowledge of the relevant factors should not turn on the inadvertence or inexperience of trial counsel, and this is particularly so where the issue of identity *is* the question of guilt or innocence. Moreover, by offering something like the following instruction, the court sets the narrow context in which racial differences are relevant,

5. Proposed Federal Rules of Evidence, Rule 401; *see* McCormick, Evidence § 152 (1954); California Evidence Code § 210.

6. Proposed Federal Rules of Evidence, Rule 403(a); *see* McCormick, Evidence § 152 (1954).

7. *See, e. g.,* Herrin v. State, 201 Miss. 595, 29 So.2d 452 (1947); State v. Thomas, 161 La. 1010, 109 So. 819 (1926); Kindle v. State, 165 Ark. 284, 264 S.W. 856

(1924); Caulery v. State, 156 Ark. 577, 247 S.W. 772 (1923); Thompson v. State, 27 Ga.App. 637, 109 S.E. 516 (1921); Hoskins v. Commonwealth, 152 Ky. 805, 154 S.W. 919 (1913); State v. Baker, 209 Mo. 444, 108 S.W. 6 (1908).

8. Proposed Federal Rules of Evidence, Advisory Committee's Note to Rule 403.

9. *See* the trial court's analysis quoted in note 3 *supra*.

and further ensures that jury consideration of these differences stays within such properly delineated bounds.

In this case the identifying witness is of a different race than the defendant. In the experience of many it is more difficult to identify members of a different race than members of one's own. If this is also your own experience, you may consider it in evaluating the witness's testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of the defendant's race that he would not have greater difficulty in making a reliable identification.[10]

LEVENTHAL, Circuit Judge, concurring:

This is to add a thought as to useful procedure for consideration of the possibility of separate instruction on inter-racial identifications, discussed in Chief Bazelon's separate opinion.

In my judgment, this subject is not appropriate for inclusion in the model instruction provided with the opinion. Whether this case may involve a problem of inter-racial identification is not knowable from the record, and the point was not argued by counsel. The issue arose only because the court became concerned with the responsibility of trial judges to focus on the general issue of

identification, concluding the time is ripe to fashion a model instruction that will help make this "a matter of routine" for trial judges.[1]

A model instruction serves a useful function of survey and synthesis, to distill outstanding judgments on matters that have been pondered by this and other courts. The issue of inter-racial identifications is not ripe for this kind of distillation of wisdom involving as it does a matter on which there is only "meager data" and an assertion of "common sense" views [2] that merit further consideration. What seems obvious to one judge, based on his experience, may be questioned by another, see Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). When we are dealing with an instruction to the jury on "the law," we are or should be dealing with propositions that reflect the wisdom of the community.

My own reflections on the subject have been enhanced by some surprises encountered in a little reading undertaken after this subject arose in conference. Although some writers say it is "a well established socio-psychological phenomenon" that members of one race recognize each other more readily than members of another race,[3] it develops that in at least one study—which apparently sought to confirm another point, that Negroes are more likely to recognize white than vice versa—the data seemed to show that Negroes recognize white faces with greater accuracy

---

10. This instruction would immediately precede the reference to identification by senses other than sight in the Model Instruction.

1. Macklin v. United States, 133 U.S.App. D.C. 139, 143, 409 F.2d 174, 178 (1969).

2. See Chief Judge Bazelon's dissenting opinion in United States v. Brown, Proctor & Williams, 148 U.S.App.D.C. at 55, 461 F.2d at 146 (March 1, 1972):
 The data on this point is unfortunately meager, but it offers at least ten-

tative support for the widely-held, common sense view that whites have greater difficulty identifying blacks than identifying other whites. And it also seems true that blacks can identify other blacks more easily than they can identify whites.

3. P. Wall, Eye-Witness Identification in Criminal Cases (1965), p. 123. No empirical data are cited.

than black faces.[4] If this is true, it would be necessary to investigate the possible explanations,[5] and to provide the explanations and qualifications needed if a model instruction is to avoid distortion, and possibly outright error.

If the instruction refers to the ultimate ingredients of the problems of identification, it might well have to note that identifiability depends on the ability (and *opportunity*) of the individual as perhaps influenced by such matters as his attitude toward the other race, the extent to which his ability to distinguish may have been enhanced by need or reward for such ability in past situations, and the factor whether in the individual instance the subject being identified had homogeneous characteristics (see note 5).

The wisdom of making haste slowly in discerning the generalization ready for inclusion in model instructions is underscored when what is involved is as sensitive as race relations in our society. If the subject of inter-racial identification is to be covered in instructions that are informative and objective, we may be opening the door to questioning and proffers of proof so that every time a witness makes an identification of an offender of another race, he is subject to cross-examination on the nature and extent of his contacts with and attitudes (favorable or not) toward the other race. The more I ponder the problems, the better I understand the kernel of wisdom in the decisions that shy away from instructions on inter-racial identifications as divisive.[6]

4. For this possibility I refer to the most recent of the studies referred to in Judge Bazelon's dissent in *Brown*. *See* R. M. Malpass (of U. of Illinois) and J. Kravitz (of Howard University), Recognition for Faces of Own and Other Race, 13 J. of Personality and Social Psychology (1969) 330, 332.

This reports a study on students at University of Illinois (13 black, 13 white) and Howard University (7 black, 7 white). To each of these subjects was shown, as stimuli, slide photographs of 40 black and 40 white males of college age, flashed on a screen. The authors calculated a recognition index ($d'$), a composite for number of correct and false identifications, indicating the superiority of performance over chance expectation. The data showed:

| | Recognition index ($d'$) at U. of Ill. | Howard U.* |
| --- | --- | --- |
| white subjects white stimuli | 1.46 | 1.44 |
| black subjects, white stimuli | 1.35 | 1.41 |
| black subjects, black stimuli | 1.31 | 1.39 |
| white subjects, black stimuli | 1.09 | 1.07 |

* The raw Howard data showed a higher $d'$ for black subjects than white subjects recognizing white stimuli. The authors found this "unexpected." The data were revised to exclude one white subject with recognition scores so low, for both white and black stimuli, that they were regarded as "distinctly deviate" and eliminated.

————◆————

5. In referring to the data that white faces are recognized more easily than black as stimuli, Malpass and Kravitz (op. cit. supra note 4) offer as possible hypotheses differences in distinctiveness of stimuli, calling for investigation "of the dimensionality of faces of the two races;" "that black faces are more homogeneous than white faces;" that both black and white persons "have had more exposure to white faces than black faces in public media and also will have had more contact with white persons where discriminative ability has positive motivational value."

6. See People v. Burris, 19 A.D.2d 557–558, 241 N.Y.S.2d 75, 76 (2d Dept. 1963) reversing because both prosecutor and court "suggested to the jury that the identification of the defendant by the complaining witness should be weighed in the light of the fact that both the defendant and the witness were negroes." In

Chief Judge Bazelon's separate opinion may well serve the useful purpose of identifying a problem that merits pondering and discussion. Perhaps this opinion, too, may be of assistance when the time comes for analysis. The more difficult question is, what is the optimum means of providing such consideration. If it is to be done solely by an appellate court, then the adversarial process—lacking in this case—would seem to be a minimum requirement. What strikes me is that this is the kind of issue which appellate judges should explore with trial judges, and with lawyers, in a manner more like that of a legislative committee, than a decision in an adversarial proceeding. There are models in this circuit in the work of committees of the Judicial Conference. There are national models in the work of committees of the American Bar Association. At least where problems require careful further exploration, these models seem to me to provide a more felicitous means of conducting such exploration—permitting common meetings on common problems between members of bench (trial as well as appellate judges), bar, and social scientists; providing time for further explorations after initial discussion; enhancing collaborative conference as distinguished from competitive or adversarial skirmish.

Mulling and interchange always take time. Yet if the problem of inter-racial identification is to be considered with discernment as well as authority, that time would be well spent.

*Burris* the court relied on People v. Hearns, 18 A.D.2d 922, 923, 238 N.Y.S.2d 173, 174–175 (2d Dept. 1963) where the issue was the voluntariness of defendant's confession. The prosecutor noted that the (police officer) witnesses testifying that it was voluntary were members of his own race. The court repudiated any "plea to the jury, based on color and race no matter how artfully phrased," and held the argument was improper. "The vice of such an argument is not only that it is predicated on a false and illogical premise, but more important it is divisive: it seeks to separate the racial origin of witnesses in the minds of the jury, and to encourage the weighing of testimony on the basis of the racial similarity or dissimilarity of witnesses."