OPINION
{¶ 1} Defendant-appellant, Tommy Williams, appeals from a Mahoning County Common Pleas Court decision convicting him of one count of murder, with a firearm specification, after jury trial.
 {¶ 2} This case involves the shooting death of Michael Booker in the parking lot of Pal Joey's, a bar located on Midlothian Boulevard in Youngstown. In the early morning hours of April 23, 2000, appellant and his friend, Robert Price were patrons at Pal Joey's as was Michael Booker. Testimony was given that appellant and Booker had exchanged words while inside Pal Joey's but that they did not engage in a fight.
 {¶ 3} Upon last call, while patrons were leaving the bar, Wendy Salata and Trish Jones engaged in an argument with Jason Emert. It continued as they proceeded into the parking lot. According to witnesses, Emert hit Salata and she hit him back. This fight occurred by Booker's automobile. At the time, Booker, Marla Salerta, and David Fitzpatrick were at Booker's vehicle putting some beer into the back. Apparently, Booker saw Emert hit Salata. Witnesses stated that Booker said he was not going to allow Emert to hit a girl. Booker then became involved in a fight with Emert.
 {¶ 4} Since it was closing time, as many as 100 bar patrons were out in the parking lot. A group formed around Booker and Emert, some joining in the fight and others observing. Emert got away from the fight momentarily and was pushed to the ground by a bouncer. A gun fell between Emert and the bouncer. Paul Guerrieri, the owner of Pal Joey's, retrieved the gun. Appellant then approached Guerrieri and asked for the gun. Guerrieri refused to give it to him. Appellant then told Guerrieri that he did not need it anyhow because he had his own gun.
 {¶ 5} Booker and Emert continued to fight when someone fired a single shot that struck Booker in the abdomen. Witnesses testified that Emert did not shoot Booker. Two witnesses, Michael Cannistra and Jason Connolly, identified appellant as the shooter. Booker died as a result of the gunshot wound.
 {¶ 6} On August 31, 2000, a Mahoning County Grand Jury indicted appellant on one count of murder, in violation of R.C.2903.02(A)(D), with a firearm specification, in violation of R.C.2941.145(A).
 {¶ 7} The case proceeded to trial on March 26, 2001 and resulted in a hung jury. It then went to trial on September 13, 2001. This time the jury returned a guilty verdict. The trial court entered its judgment entry of sentence on September 27, 2001. It sentenced appellant to a term of incarceration of 15 years to life for the murder conviction and three years for the firearm specification, to be served consecutively.
 {¶ 8} Appellant filed a timely notice of appeal on September 28, 2001. After some confusion about who was to represent appellant and several extensions of time, appellant filed his brief on May 19, 2003.
 {¶ 9} Appellant raises two assignments of error, the first of which states:
 {¶ 10} "The trial court erred by refusing to give the instruction on eyewitness identification, requested by appellant, as there were numerous instances, at trial, where the eyewitness identification was conflicting and confusing and identification of the appellant was the central issue of the trial."
 {¶ 11} Appellant asserts the trial court should have given the jury the instruction his counsel provided on eyewitness testimony. This case depended on Cannistra's and Connolly's identifications of appellant. Both witnessed the shooting and picked appellant's photograph out of a photo lineup. (Tr. 421, 629-30). And they both identified appellant at trial as Booker's shooter. (Tr. 417-18, 625). No physical evidence linked appellant to the crime. Additionally, Jones eliminated appellant's photo from the lineup and Fitzpatrick picked out a different photo who he thought was the shooter. (Tr. 380, 687-88).
 {¶ 12} Appellant requested that the court instruct the jury pursuant to U.S. v. Telfaire (D.C. Cir. 1972), 469 F.2d 552, as follows:
 {¶ 13} "One of the most important issues in this case is the identification of the Defendant as the perpetrator of the crime. The State of Ohio has the burden of providing [sic.] identity beyond all reasonable doubt. It is not essential that the identifying witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the Defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the Defendant was the person who committed the crime, you must find the Defendant not guilty.
 {¶ 14} "Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later. In appraising the identification testimony of a witness, you should consider the following:
 {¶ 15} "(1) Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender? Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past.
 {¶ 16} "(2) Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account both the strength of the identification, and the circumstances under which the identification was made. If the identification by the witness may have been influenced by the circumstances under which the Defendant was presented to him for identification, you should scrutinize the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see Defendant, as a factor bearing on the reliability of the identification.
 {¶ 17} "(3) You may take into account any occasions in which the witness failed to make an identification of Defendant, or made an identification that was inconsistent with his identification at trial.
 {¶ 18} "(4) Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.
 {¶ 19} "I again emphasize that the burden of proof on the State of Ohio extends to every element of the crime charged, and this specifically includes the burden of proving beyond all reasonable doubt the identity of the Defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the Defendant not guilty." (Defendant's Proposed Supplemental Instruction to Trial Jury).
 {¶ 20} Instead, the trial court instructed the jury pursuant to Ohio Jury Instructions 405.20(5) as follows:
 {¶ 21} "Now, in this case there are some additional instructions concerning the testimony that was offered. And some of the things that you may consider in weighing the testimony of identifying witnesses are the things I just told you and the normal test that you use, and the following: The capacity of the witness, that is, the age, intelligence, defective senses, if any; the opportunity that that particular witness had to observe the defendant; the witness' degree of attention at the time he or she observed the offender; the accuracy of the witness' prior description of identification of the offender; whether the witness had had occasion to observe the defendant in the past; the interval of time between the event that occurred, the crime that occurred, and the identification of the defendant; all surrounding circumstances under which the witness has identified the defendant, including any deficiencies in any lineups or photo displays or one-on-one identifications, and whether or not you determine that those identifications made from a photo array were sufficient.
 {¶ 22} "If after examining the testimony of any identifying witnesses you are not convinced beyond a reasonable doubt that the defendant is the person who committed this crime, then you must find the defendant not guilty. If, however, after examining the testimony of the identifying witnesses and all of the other testimony you are firmly convinced beyond a reasonable doubt that the defendant is the offender, then you must find the defendant guilty." (Tr. 927-28).
 {¶ 23} Appellant argues the trial court's instruction was not sufficient. He contends that since the instruction he submitted was a correct statement of the law, pertinent to the case, and timely presented, the trial court was required to include it in the general charge, at least in substance. Citing, State v.Guster (1981), 66 Ohio St.2d 266, 269. Appellant argues that the instruction had to emphasize the need for finding that the circumstances of the identification were convincing beyond a reasonable doubt. Citing, Telfaire, 269 F.2d at 555. He claims the instruction he requested did this, while the trial court's instruction did not.
 {¶ 24} When reviewing a trial court's jury instructions, an appellate court must consider whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. Statev. DeMastry, 5th Dist. No. 02 CA 9, 2003-Ohio-5588, at ¶ 72;State v. Wolons (1989), 44 Ohio St.3d 64, 68. An abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Keenan (1998), 81 Ohio St.3d 133, 137;State v. Adams (1980), 62 Ohio St.2d 151, 157. Furthermore, we must consider the jury instructions as a whole and not view a single portion in isolation. State v. Jalowiec (2001),91 Ohio St.3d 220, 231. A trial court need not give requested jury instructions if the instructions it does give are adequate.State v. Cook (1992), 65 Ohio St.3d 516, 525.
 {¶ 25} The Ohio Supreme Court examined the Telfaire
instruction in Guster, supra. In Guster, an off-duty police officer was shot while working a side job. The officer was able to observe the shooter in a brightly lit hallway for about ten seconds before the man shot him and for at least another ten seconds after he was shot. Other than the officer's identification of his shooter, no other witnesses or evidence corroborated the shooter's identity. At trial, the defendant requested that the court give a Telfaire instruction. The court refused and gave only its standard instructions.
 {¶ 26} After he was convicted, the defendant appealed arguing it was reversible error for the court to refuse to give a special eyewitness identification instruction. The Ohio Supreme Court held that whether to give a Telfaire-like cautionary instruction depended in large part on whether a resolution by the jury of the disputed issues in the case required or would be clearly assisted by the instruction. Id. at 271. The court further stated that this determination could not be directed by a general rule, but should be decided upon the particular facts of the case by the exercise of sound discretion. Id.
 {¶ 27} In examining the facts of the case, the court concluded that the trial court did not abuse its discretion in deciding not to give a special instruction on eyewitness identification. The court found that the infirmities said to attach to eyewitness identification, which necessitate a cautionary instruction, were largely or wholly absent under the facts. Id. at 272. It pointed out that the eyewitness was a trained police officer who observed the defendant in optimum surroundings and for a sufficient amount of time. Id. The court further pointed out that the witness gave his initial description of the assailant the same night as the shooting, and was generally consistent with the physical characteristics of the defendant. Id. Additionally, the court noted the witness's subsequent identification from the photographs and lineup was both immediate and without equivocation. Id.
 {¶ 28} In a case similar to the present case, the Second District concluded the trial court did not abuse its discretion in giving its own version of the Telfaire instruction. Statev. Hutchinson (May 10, 1995), 2d Dist. No. CA 13993. InHutchinson, as in this case, two witnesses identified the defendant as one of two men who robbed a bank. These witnesses had only a limited opportunity to observe the perpetrator. Other witnesses identified the defendant under circumstances that supported an inference that he was the perpetrator, although they did not see him at the bank where the robbery occurred. Additionally, two witnesses at the scene were unable to identify the defendant. The defendant was convicted, and on appeal argued the court erred in not giving the jury the Telfaire
instruction. The court of appeals found that all of the points of the Telfaire instruction, except the point noting that the credibility of each identification witness was considered in the same way as any other witness, were covered in the trial court's instruction. It also noted that the court gave the jury the standard instruction regarding its duty to consider the credibility of witnesses. Thus, the court concluded the trial court did not abuse its discretion when it gave a shorter version of the Telfaire instruction that included all of the essential concepts.
 {¶ 29} As was the case in Hutchinson, in the case sub judice, the trial court agreed with appellant that the facts warranted a cautionary instruction on eyewitness identification. Appellant's complaint is that the instruction the court gave did not contain the substance of the Telfaire charge. A close comparison of the two charges however, reveals that the court's charge was substantially similar to the Telfaire charge. The only components of the Telfaire charge that the OJI charge did not include were the following: (1) the jury should consider how far or close the witness was to the offender, (2) the jury should consider the lighting conditions, and (3) a re-emphasis of the burden of proof, specifically the State's burden of proving the defendant's identity. While the court's charge left out two of the tests from the Telfaire charge, it included at least nine of the Telfaire tests. In addition to the special eyewitness identification instruction, the court also instructed the jury regarding witness credibility as follows:
 {¶ 30} "To weigh the evidence you must consider the credibility of all of the witnesses who testified, and that includes the defendant. You will apply the test of truthfulness which you use in your daily lives.
 {¶ 31} "* * * the bottom line is you have to decide whether you believe or disbelieve the witnesses, and you can use any test which you normally use in your daily lives to determine whether or not someone is telling you the truth. These tests include, but are not limited to, the appearance of the witness upon the witness stand; the witness' manner of testifying; the reasonableness of the testimony offered; the opportunity that witness had to see and hear and know or perceive the things concerning which he or she testified; that witness' accuracy of memory; frankness, or lack of it; intelligence; interest in the outcome of the case; and bias, if any; together with all the facts and circumstances surrounding the witness' testimony." (Tr. 925-26).
 {¶ 32} Furthermore, the court re-emphasized the State's burden of proof twice more after giving the eyewitness instruction:
 {¶ 33} "Before you can find the defendant guilty of the crime of murder you must find beyond a reasonable doubt that on or about the 23rd day of April, 2000, in Mahoning County, Ohio, the defendant, Tommy Williams, purposely caused the death of another.
 {¶ 34} "* * *
 {¶ 35} "So the offense of murder is that on or about April 23, 2000, at Mahoning County, Ohio, Tommy Williams did purposely cause the death of another human being, that human being being Michael Booker. If you find that the State of Ohio proved beyond a reasonable doubt all of the essential elements of the offense of murder, then it is your duty to return a verdict of guilty. If you find that the State failed to prove any one of the essential elements of the offense of murder beyond a reasonable doubt, then it will be your duty to find the defendant not guilty." (Tr. 930-31, 934).
 {¶ 36} Thus, the court's jury instructions, taken as a whole, substantially complied with appellant's requested instructions. Accordingly, appellant's first assignment of error is without merit.
 {¶ 37} Appellant's second assignment of error states:
 {¶ 38} "The jury's verdict is against the manifest weight of the evidence and must be reversed as a matter of law."
 {¶ 39} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 40} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 41} Appellant was convicted of violating R.C. 2903.02(A), which provides, "No person shall purposely cause the death of another * * *." He was also convicted of a firearm specification under R.C. 2941.145(A).
 {¶ 42} The evidence at trial revealed the events that occurred the night of the shooting.
 {¶ 43} Trish Jones and Wendy Salata went to Noday's Bar in Austintown. (Tr. 143, 213). There they saw appellant and Robert Price. (Tr. 144). Jones stated that, at the time, appellant had a "cornrow" hairstyle with some of the braids "flipped up" and was wearing a red, white, and blue outfit. (Tr. 148, 177, 179). She stated Price was wearing a red flannel jacket. (Tr. 147). Salata stated that appellant had his hair in a "Coolio" style. (Tr. 231). A "Coolio" hairstyle can best be described as cornrow-type braids that stick up from the head. (See Defendant's Exh. 2). Salata also stated that appellant was wearing either a red jacket with blue in it or a blue jacket with red in it. (Tr. 233, 257).
 {¶ 44} The girls left Noday's and went to Pal Joey's, where they again saw appellant and Price. (Tr. 152, 213). At Pal Joey's they also saw Jason Emert and Lynden Nelson, who were associated with appellant and Price. (Tr. 148-49). Near last call, Jones and Salata became involved in a verbal argument with Emert. (Tr. 155-56, 213). The argument continued outside. (Tr. 157). Eventually, Emert punched Salata. (Tr. 158, 218). She punched him back. (Tr. 158, 219). Apparently, Michael Booker saw the fight. (Tr. 161). Jones and Salata heard Booker say that he was not going to let Emert beat up a girl and then, Booker was fighting with Emert while the girls moved out of the way. (Tr. 161, 238).
 {¶ 45} Earlier that night, Marla Salerta went to Pal Joey's where she met up with Booker and some other friends. (Tr. 98-99). Salerta testified that she got into a minor argument with Emert because he kept bumping into her while she was sitting at the bar with Booker. (Tr. 100-101). She also indicated that appellant had taken Booker's seat next to her at the bar. (Tr. 105). She told him that it was Booker's seat and appellant replied, "That's not Michael's seat. This is my seat now." (Tr. 106).
 {¶ 46} Chris Davis, a friend of Salerta's and Booker's, testified that Salerta pointed out to him that Booker got involved in some sort of argument with Emert and appellant having to do with taking someone's seat. (Tr. 265). Davis also testified that Booker told him that night that he thought he was going to be "jumped" because he had had a problem with Emert and appellant. (Tr. 276).
 {¶ 47} Jason Connolly also went to Pal Joey's that night to meet Booker, David Fitzpatrick, and other friends. While he was sitting at the bar, Fitzpatrick called Connolly over to the area where he was with Booker. (Tr. 612). Fitzpatrick told Connolly that Booker was "having a problem" with some kids behind him. (Tr. 612). Standing behind Booker, Connolly observed a white heavyset man with an ace bandage around his arm (presumably Emert) and a black man with cornrows, who he later identified as appellant. (Tr. 613, 671).
 {¶ 48} Paul Guerrieri, the bar owner, also testified that he noticed a confrontation between Booker and others in the bar. (Tr. 296). He was not sure who Booker was arguing with, but noted that appellant and Emert were in the area. (Tr. 297). He had known appellant for approximately eight years, as appellant had worked for him at a car wash. (Tr. 298).
 {¶ 49} Frank Guerrieri, a bartender, also noticed an argument in the bar that night. He stated that he went to the area of the argument and noticed that the group involved in the argument included Booker, appellant, and Nelson. (Tr. 469-73).
 {¶ 50} Michael Cannistra was also a patron at Pal Joey's that night. (Tr. 397). He testified that he observed an argument in the bar involving four men. (Tr. 399). Cannistra stated that he did not know their names at the time. (Tr. 399). He described them as follows: one was heavyset with longer, shoulder length braids; one was shorter with a shaved head and a red and black flannel; one had on a dark blue or black Indians type jersey with a white stripe across the front. (Tr. 399-401). These descriptions appear to match those of Nelson, Price, and appellant.
 {¶ 51} Salerta left the bar at closing time with Booker and went out to his car. (Tr. 108). While they were at the car, they noticed an argument between a man and a woman. (Tr. 111-12). Salerta told Booker to get into the car, but he would not listen. (Tr. 113). She testified that she then went back into the bar to get help because she knew something was not right. (Tr. 113).
 {¶ 52} At closing time, Connolly also went out to Booker's car. (Tr. 615). Connolly noticed a scuffle between a couple of girls and the men that Booker had had a problem with in the bar. (Tr. 616). Connolly stated that Booker watched this scuffle and said that one of the guys hit one of girls. (Tr. 617). Connolly testified that Booker then took off towards that group and a fight ensued. (Tr. 617-19).
 {¶ 53} Fitzpatrick testified that he too left the bar at closing time and went to Booker's car. (Tr. 680). He saw the fight involving a girl and testified that when Booker saw Emert hit a girl, he got in the middle of it. (Tr. 681).
 {¶ 54} Paul Guerrieri testified that he went outside behind the bar when he became aware there was a fight. (Tr. 301). He stated that one of his bouncers was trying to restrain Emert and a gun fell down. (Tr. 302). Guerrieri picked up the gun and put it in his pants. (Tr. 302). He stated that a kid with a red flannel shirt (Price) tried to pick up the gun at the same time. (Tr. 303). Guerrieri testified that within a couple of minutes, appellant approached him and asked for the gun. (Tr. 303-304). According to Guerrieri, appellant said it was his cousin's gun and he wanted it back. (Tr. 304). Guerrieri refused to give appellant the gun, and according to Guerrieri, appellant then stated he did not need the gun because he had his own gun. (Tr. 304). Guerrieri testified appellant then ran towards the area of the fight. (Tr. 305). Within seconds, Guerrieri heard a gunshot. (Tr. 306). He then observed appellant running to the back of the parking lot towards the woods. (Tr. 306-307, 329).
 {¶ 55} According to all of the witnesses, Booker and Emert fought in the parking lot while a large crowd gathered around them. A shot was fired and Booker was hit.
 {¶ 56} Fitzpatrick testified that he was helping Booker up during the fight when he heard a muzzled blast sound and felt a shot on his arm. (Tr. 683-84). At first, Fitzpatrick thought the shot might have come from the man with the ace bandage (Emert) who was on the ground and had been fighting with Booker. (Tr. 684). Fitzpatrick looked at Emert and saw he did not have a weapon. (Tr. 684).
 {¶ 57} After she heard the shot, Jones too looked directly at Emert. She testified he looked shocked and he did not have a gun in his hands. (Tr. 168-69).
 {¶ 58} Fitzpatrick testified that he noticed a gun in someone's hand when he looked down. (Tr. 684-85). He stated he saw the person with the gun run away, but could not tell who it was. (Tr. 685). Unlike the others, Fitzpatrick testified that the shooter ran towards the street at an angle. (Tr. 685).
 {¶ 59} Cannistra testified that he watched the fight in the parking lot. (Tr. 410). He stated he saw a man run from around the back of the building in a crouched position. (Tr. 410-11). Cannistra testified he saw the man take a gun from his waistband and point it towards the fight. (Tr. 411). At this point, the gunman was between Cannistra and the fight with his back to Cannistra. (Tr. 411-14). Next, Cannistra saw a flash and heard a bang. (Tr. 414-15). Cannistra testified that the gunman then ran towards the woods. (Tr. 415-16). He stated that he told the police that this man had cornrows that stuck up from his head and had a puffy jacket on. (Tr. 717).
 {¶ 60} Connolly testified that he too watched the fight. (Tr. 620). He testified that he saw the same black man he had seen earlier that night in the bar who was involved in the confrontation with Booker. (Tr. 626). Connolly stated that he watched this man come from behind the bar, walking at a fast pace, towards the area where Booker was. (Tr. 623). Connolly stated that the man was standing "sort of straight." (Tr. 663). When the man got to within two or three feet from Booker, Connolly testified, he saw the man's arm emerge from his chest. (Tr. 623). Connolly testified he then saw a big flash and heard a big pop. (Tr. 623). He testified that he saw a silver tip that appeared to be a barrel of a gun in the man's hand (Tr. 623). Next, Connolly saw the man run towards the woods. (Tr. 624).
 {¶ 61} Almost immediately after the shot was fired, Salata, Cannistra, and Frank Guerrieri saw Price run to his car in the parking lot. (Tr. 225, 423, 476-77). They saw people either grab Price or drag him from the car. (Tr. 225, 423). Robert Baldwin, an off-duty Mahoning County reserve deputy, grabbed Price and took him back in the bar. (Tr. 571). Baldwin heard the crowd in the parking lot saying that Price was with the shooter. (Tr. 570, 576). Davis, Paul Guerrieri, and Officer William Burton all testified that the buzz in the parking lot after Booker was shot was that appellant was the shooter. (Tr. 288, 331, 521). Paul Guerrieri testified that appellant's brother, Michael Williams, came to the scene looking for appellant after the shooting. (Tr. 331). He asked Guerrieri "what happened tonight?" and "what did Tommy do?" (Tr. 311, 331). Guerrieri told him that he thought appellant was in trouble because he believed he shot someone. (Tr. 311, 331). Guerrieri testified that he told Williams this based upon what others had said that night. (Tr. 331).
 {¶ 62} Detective Sergeant Jose Morales testified that after interviewing approximately eight witnesses the morning of the shooting, he began looking for appellant in reference to the shooting. (Tr. 347-48).
 {¶ 63} Cannistra and Connolly both identified appellant as the shooter. (Tr. 417, 625). Cannistra described the shooter as being between 5'10" and 6' foot, with light to medium skin, tight corn rowed hair, and wearing a dark blue baseball-style shirt with a white stripe across the front with Cleveland Indians' type colors. (Tr. 416-17). He also testified he picked appellant's picture from a photo lineup the morning of the shooting. (Tr. 421-22). Detective Morales also testified that Cannistra picked appellant's picture out of a photo lineup. (Tr. 350).
 {¶ 64} Fitzpatrick also picked a picture out of a photo lineup that was supposed to be the shooter. (Tr. 687). However, he did not choose appellant's picture. (Tr. 689).
 {¶ 65} Connolly did not talk to the police until May 5. (Tr. 353). Detective Morales contacted him and asked him to come to the station to give a statement. (Tr. 627-28). Connolly picked appellant's picture from a photo lineup as being the shooter. (Tr. 353-54, 629-30). Connolly stated that Detective Morales attempted to get in touch with him between the time he made the identification and August 23, when he went back to the station to give a video statement. (Tr. 631). Connolly testified he did not go to the station sooner because he was afraid since the person he identified as the shooter had not yet been apprehended. (Tr. 631-32). Once Detective Morales told Connolly that the shooter had been caught, Connolly went back to the station and gave his video statement. (Tr. 632).
 {¶ 66} Appellant took the stand in his own defense. Appellant's version of the facts closely parallels that of the other witnesses, with some exceptions. Of course, the biggest exception was appellant testified that he did not shoot Booker. (Tr. 735). In fact, he stated that he did not even have a gun that night. (Tr. 735).
 {¶ 67} Appellant stated that he went out with Price that night. (Tr. 736). At Pal Joey's, appellant noticed that Nelson was involved in a heated discussion with a girl, whom he later found out was Salerta. (Tr. 756). So appellant made his way over to them. (Tr. 756). Appellant also stated that while he was at the bar he called out to the bartender, "Mikey," a few times. (Tr. 758). He testified that Booker thought he was talking to him and looked over. (Tr. 758). Booker asked appellant if he was talking to him, and appellant said no. (Tr. 758-59). Appellant stated this was the only conversation he ever had with Booker. (Tr. 759).
 {¶ 68} Appellant testified that when he left the bar, he found Emert outside arguing with Salata. (Tr. 763). He saw her swing at Emert, so appellant tried to grab her arms and move her away. (Tr. 764). Appellant stated he then noticed Emert and Price running through the parking lot like they were being chased. (Tr. 765). Next, appellant stated, one of the bouncers grabbed Emert and knocked a gun from his hand (Tr. 766). Appellant then saw Paul Guerrieri pick the gun up. (Tr. 767). Appellant stated he approached Guerrieri near the back of the building and asked for the gun. (Tr. 767). He claimed he asked for the gun so he could shoot it in the air to disperse the crowd. (Tr. 768). He stated that when Guerrieri refused to give him the gun, appellant asked him to shoot it in the air. (Tr. 768-70). But Guerrieri contradicted this testimony when he testified appellant never asked him to fire the gun. (Tr. 328). Appellant also stated that he told Guerrieri he had his own gun. (Tr. 768-69). But appellant testified he did this only to scare Guerrieri into giving him the gun. (Tr. 769). Appellant testified that he saw Guerrieri reach for the gun, so he ran away. (Tr. 772). He said he then heard a shot and ran up towards Midlothian Boulevard. (Tr. 772).
 {¶ 69} Furthermore, appellant admitted he found out that the police were looking for him three or four days after the shooting. (Tr. 804). He also admitted that when the police finally arrested him, he was hiding upstairs at his sister's house. (Tr. 804-805).
 {¶ 70} Appellant points to certain aspects of the testimony, which he claims demonstrate the jury's verdict was against the weight of the evidence. First, he takes issue with the eyewitness identifications. Appellant claims Cannistra's and Connolly's testimony conflicted with each other and other witnesses' testimony. For instance, he notes that Cannistra testified appellant was wearing a dark blue or black Cleveland Indians type shirt, with a white stripe in the front, and baggy jeans. (Tr. 426-27). However, Jones testified appellant was wearing a red, white, and blue, jogging suit that was primarily red. (Tr. 177). And Connolly could not describe appellant's clothing. (Tr. 636).
 {¶ 71} The witnesses' descriptions of appellant have a lot in common with each other and with appellant's own description of what he was wearing and who he was with the night of the shooting. Appellant testified he wore light blue pants, a gray and red shirt, and a red, white, and blue jacket. (Tr. 751-52). They all testified appellant was wearing some combination of red, white, and blue. They all testified appellant had braids in his hair. They all testified they saw him with the same people (Price, Emert, and Nelson). While specific details of each witnesses' testimony were different (i.e., was his shirt primarily red or primarily blue?, were his braids flat against his head or sticking up some?), this is to be expected in this type of situation. All of the witnesses testified the bar was crowded that night. They all testified that pandemonium ensued in the parking lot at the time of the fight and shooting. The discrepancies in the details of appellant's appearance should not be said to render the jury's verdict against the weight of the evidence. Furthermore, there was no evidence that someone similar looking to appellant was present at the scene, which would give the need to distinguish appellant from another possible suspect.
 {¶ 72} Additionally, appellant notes that Cannistra testified that the shooter ran from behind Pal Joey's in a crouched position to the area of the fight. (Tr. 410-11). However, Connolly testified the shooter walked quickly towards the fight, but did not run. (Tr. 623). But whether appellant walked quickly or ran could simply be a matter of the particular witness's perception.
 {¶ 73} Another example appellant points to is the witnesses' testimony about people running into the woods. For instance, Salerta testified she saw three or four people run into the woods after the shooting. (Tr. 137). Davis stated he saw two people run towards the woods. (Tr. 266). And Fitzpatrick testified the shooter ran towards Midlothian. (Tr. 685). Again, this type of discrepancy can be expected when a large crowd of people observes something.
 {¶ 74} Appellant also points out that several witnesses did not identify him as the shooter in a photo lineup. However, these witnesses that appellant refers to (Salerta, Jones, and Salata) all testified that they did not see the person who shot the gun. (Tr. 113-14, 165, 221-22). Thus, the fact that they could not identify appellant from a photo lineup is irrelevant.
 {¶ 75} The jury was able to listen to all of the witnesses testify, including appellant. They had the opportunity to take into account the witnesses' demeanor, voice inflections, and body language. They were also able to consider the inconsistencies and weigh each witness's individual credibility. Issues of witness credibility are best left to the trier of facts. DeHass,10 Ohio St.2d 230, at paragraph one of the syllabus. Since competent, credible evidence exists on the record to support the verdict, we will not disturb the jury's findings on the evidence. Accordingly, appellant's second assignment of error is without merit.
 {¶ 76} For the reasons stated above, the trial court's judgment is hereby affirmed.
Waite, P.J., concurs.
DeGenaro, J., concurs.