# IN THE COURT OF APPEALS OF IOWA

No. 17-0639
Filed June 6, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT CHRISTOPHER CARROLL,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Sioux County, Robert J. Dull, District
Associate Judge.

A defendant appeals from his conviction for operating while intoxication.
**AFFIRMED.**

Michael J. Jacobsma of Jacobsma Law Firm, PC, Orange City, for
appellant.

Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant Attorney
General, for appellee.

Considered by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**TABOR, Judge.**

Motorcyclist Robert Carroll appeals his conviction for operating while intoxicated. He contends the district court's refusal to instruct the jury concerning factors to consider when evaluating eyewitness-identification testimony entitles him to a new trial. Carroll also assails his attorney's performance, asserting counsel was constitutionally remiss in not objecting to prior bad acts evidence and by not filing a motion to suppress evidence obtained during an unlawful search and seizure. Because the jury's verdict did not hinge on the eyewitness identification in this case, refusal to give the instruction was not reversible error. We affirm Carroll's conviction and preserve his ineffective-assistance-of-counsel claims for further development in postconviction-relief proceedings.

## I.    Facts and Prior Proceedings

On the evening of September 16, 2016, Sarah and Cory Nibbelink were driving through Sioux Center with their two young children when a loud motorcycle drew their attention. The motorcycle "jumped a curb" on the left side of the road and passed them on the driver's side in a residential area. Once the motorcycle pulled in front of the Nibbelinks, it was "kind of swerving into the other lane." The cyclist slowed down for a stop sign, but was weaving and "struggling a little bit to stay upright." After the stop sign, the motorcycle lost control, spun in a circle, and "laid it down on the ground." Sarah noticed something, maybe a mirror, drop onto the ground at the crash site.

Sarah pulled into a driveway and called 911 to report what she believed to be a drunk driver. In the call, she described the motorcycle as having high handlebars with a chain or tassel hanging from one side. While Sarah was talking

to the 911 dispatcher, the cyclist got up, remounted the motorcycle, and drove westbound at a high speed—as fast as 80 miles per hour by Sarah's estimate. Sarah and Cory followed the motorcycle's taillight, which they could see in the dark, not encountering any other vehicles. A few miles away, the motorcycle pulled into a driveway. Sarah handed the phone to Cory, who knew the property was owned by a farmer named Brantsen. The dispatcher advised that officers were en route to the farm so the Nibbelinks could go on their way. Neither Sarah nor Cory identified the motorcyclist by name to the dispatcher.

After the 911 call ended, the Nibbelinks drove back to the crash site to see if the cyclist had dropped something—finding a smashed beer can on the road and another that had rolled to the shoulder. Sarah later described the cans as sixteen-ounce Budweisers with American flag labels.

At trial, Sarah described the cyclist as a man around fifty years of age with a mustache and goatee and blond or white hair. She recognized the motorcycle from seeing it "around town on cruise nights." On cross-examination, defense counsel asked if she had ever met the person who was riding the motorcycle. She testified she had seen the driver before but had never "personally had a conversation" with him. She acknowledged the motorcycle went by quickly and she "just had a glance" at the driver. "I can't say a hundred percent that it was him." On redirect, Sarah testified she was familiar with Carroll because she had worked with his wife, Susan, at a gas station a few years earlier. On recross-examination, Sarah testified she "assumed" it was Carroll riding the motorcycle.

Cory testified to the same events. He also identified a motorcycle with high-rise handlebars with a tether on the right-hand side. Cory recalled seeing the motorcycle on occasion around town, typically parked outside Susan Carroll's house. Cory believed Robert Carroll also lived there. Cory described the cyclist as having gray or blond hair and wearing a bandana and a jacket. He estimated the driver's weight around 200 pounds and age around fifty years. Cory testified he had seen the driver around town but did not know him personally. Cory recalled the motorcycle landing on its left side when it tipped over. Cory saw "something fall away from the bike when he dumped it on its side."

Officer Josh Koedam arrived first at the Brantsen residence and turned on his squad car's spotlights. Looking inside the house, the officer could see two men. The officer also saw a motorcycle parked, nose first, in the open garage. The motorcycle had high handlebars with a tassel hanging from one bar. Later, when the officer approached the motorcycle, he heard noises like it had been recently operated. Officer Koedam was familiar with the motorcycle and its owner, Carroll. The officer walked to the door, met Brian Brantsen, and asked to speak to the operator of the motorcycle. Brantsen claimed no one else was there. When Koedam told Brantsen he had already seen another person in the house, Brantsen called to Carroll. Carroll denied being involved in an accident but said he "had simply lost his glasses while riding his motorcycle, had turned around to pick up his glasses, and had tipped his motorcycle over and then proceeded westbound."

Carroll showed Koedam his motorcycle in the garage. Koedam saw minor damage on the left handle and scrape marks on the clutch. The officer could smell a "very strong odor of an alcoholic beverage" coming from Carroll and asked him

how much he had to drink that night. Carroll admitted drinking eight sixteen-ounce beers but commented "he was not sure if he was over the limit or not." Carroll had unsteady balance, slurred speech, and red, watery eyes. So when Officer Ulf Schaefer arrived, he conducted field sobriety tests. Carroll told Schaefer he had been riding the motorcycle and tipped over after stopping to pick up a bandana. The officers arrested Carroll for operating while intoxicated. At the police station, Carroll submitted to a breath test, revealing a blood alcohol concentration of .132.

Before trial, Carroll sought to exclude any reference to prior convictions, arrests, wrongful acts, or allegations of wrongful acts. The court granted the motion in limine, "except that any prior convictions of Defendant allowable for impeachment purposes under the rules" were permitted.

At trial, Carroll testified a man named Luke, whose last name he didn't know for sure, was test-driving the motorcycle that night. According to Carroll, he and Luke rode two separate motorcycles to Brantsen's house. Supposedly, Luke returned to town on the high handlebar motorcycle to buy cigarettes, rode back to Brantsen's house, but left before the police arrived. Carroll testified Luke "took off running," but Carroll didn't know why. Carroll testified he failed to tell police about Luke because "snitching" was against the code of their motorcycle club. Carroll also told the jurors he was not on good terms with Officer Koedam—professing to "multiple run-ins with him" about the motorcycle.

The defense also offered testimony from Carroll's wife, Susan, and Brantsen. Susan corroborated Carroll's story that he left their home that evening with his friend, Luke. Brantsen testified he was showering when he heard Carroll enter his house with another person. By the time he finished, only Carroll was at

his house. Brantsen did not see another person or know who it was. He did not hear sounds of motorcycles approaching or leaving his house.

At the close of evidence, Carroll asked the court to caution the jurors about eyewitness identifications. Iowa Criminal Jury Instruction 200.45 provides:

> The reliability of eyewitness identification has been raised as an issue. Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to see the person at the time of the crime and to make a reliable identification later.
> In evaluating the identification testimony of a witness, you should consider the following:
> 1. If the witness had an adequate opportunity to see the person at the time of the crime. You may consider such matters as the length of time the witness had to observe the person, the conditions at that time in terms of visibility and distance, and whether the witness had known or seen the person in the past.
> 2. If an identification was made after the crime, you shall consider whether it was the result of the witness's own recollection. You may consider the way in which the defendant was presented to the witness for identification, and the length of time that passed between the crime and the witness's next opportunity to see the defendant.
> 3. An identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.
> 4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification.

The court declined to give the instruction saying, "I don't believe there is any issue in the facts." In closing argument, the prosecutor emphasized the Nibbelinks' description of the motorcycle driver matched the person arrested by the officers at Brantsen's house. But defense counsel told the jurors, "It's interesting to know that both Sarah and Cory were more familiar with the motorcycle than who was riding it." Counsel urged reasonable doubt because the witnesses "just assumed it was Robert Carroll." The jury returned a guilty verdict.

On appeal, Carroll contends the court erred in not giving the eyewitness-identification instruction. He also asserts trial counsel should have objected to testimony concerning his past interactions with police. Carroll further asserts counsel was ineffective in failing to file a motion to suppress to challenge his seizure by police at Brantsen's house and the garage search.

## II.    Analysis

### A.  Jury Instruction on Eyewitness Identification

We review challenges to jury instructions for correction of errors at law. *State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018). "Jury instructions must convey the applicable law in such a way that the jury has a clear understanding of the issues it must decide." *Id.* at 138 (quotation omitted). If a requested instruction correctly states the law, applies to the case, and the concept is not covered elsewhere in the instructions, "the court must give the requested instruction." *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996). But any error in refusing to give an instruction will not merit reversal "unless it results in prejudice to the defendant." *Id.* We presume an instructional error is prejudicial unless the record affirmatively establishes no prejudice resulted. *See State v. Ambrose*, 861 N.W.2d 550, 554 (Iowa 2015).

At issue here is Iowa Criminal Jury Instruction 200.45, sometimes called the *Telfaire* instruction. *See United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972). In *State v. Tobin*, our supreme court stated:

> The *Telfaire* instruction reminds jurors that one of the most important issues in this case is the identification of the defendant as the perpetrator of the crime and that identity must be proven beyond a reasonable doubt. It advises that many factors should be taken into account in evaluating identification testimony, including capacity and

opportunity to observe, circumstances under which the initial and subsequent identifications were made, length of time between the event and the identification, subsequent ability or inability to identify, and credibility.

338 N.W.2d 879, 880 (Iowa 1983) (quotations omitted). But, where "other, independent, evidence supports the eyewitness testimony" and "the indicia of reliability of the eyewitnesses are relatively strong[,] . . . the need for the *Telfaire* instruction is proportionately reduced." *Id.*

Carroll insists the district court erred in declining to give this instruction because the identity of the motorcycle driver was key to the State's case, and eyewitnesses Sarah and Cory Nibbelink did not provide reliable identifications of him as the driver. The State responds, "Even assuming the district court should have given Carroll's requested instruction, no prejudice resulted." We agree with the State that refusal to give the instruction was not reversible error under the circumstances here. *See id.* at 881 (while not discouraging use of the *Telfaire* instruction, holding refusal to give instruction was not "reversible error").

As an initial matter, the instruction discusses the opportunity of a witness to see the accused at the time of the crime and then "to make a reliable identification later." The Nibbelinks offered the jurors a description of the motorcycle and the driver but did not actually identify Carroll in the courtroom as the driver. Instead the witnesses inferred the driver was Carroll because they associated him with the distinctive motorcycle they had seen in Sioux Center on previous occasions. Examining a similar scenario where no direct trial identification occurred, our court found no error in refusing to give the eyewitness identification instruction. *State v. Ford*, No. 02-1056, 2004 WL 1898240, at *2 (Iowa Ct. App. Aug. 26, 2004) ("The

witnesses described a person involved in the fight, and left for the jury to determine whether Ford met that description.").

But even if the Nibbelinks' testimony constituted an identification of Carroll, the requested instruction was not critical to the jury's determination of the driver's identity. The jury knew the limitations faced by Sarah and Cory in observing the motorcycle driver, and other independent evidence in the record supported their eyewitness testimony. Sarah and Cory admitted they had little time to observe the incident. But their physical description of the driver matched the person encountered by officers at the motorcycle's destination. *See State v. Hohle*, 510 N.W.2d 847, 849 (Iowa 1994) (declining to grant a new trial based on absence of eyewitness-identification instruction where "police testified that Hohle was the only person in the crowd matching the description"). Plus, Sarah and Cory both identified a motorcycle with distinctive features—high handlebars and a tassel on one side—which matched the motorcycle in Brantsen's garage.

Other facts in the record support their testimony: Carroll told officers he had been riding the motorcycle that night and had dropped something, causing him to stop and tip his bike over. He claimed the motorcycle sustained no damage, but officers saw scrape marks on the left side where Cory's testimony suggested they would be. The Nibbelinks spotted sixteen-ounce beer cans at the crash site, and Carroll told officers he had been drinking sixteen-ounce cans.

Reasonable jurors could have questioned the veracity of Carroll's testimony that another person, someone named Luke, actually drove the motorcycle that night and then inexplicably bolted on foot when police arrived. The officers did not

find Luke's motorcycle at Brantsen's farm.[1]  Carroll's credibility was impacted by his changing story regarding whether he drove the motorcycle that night and what he dropped—his glasses or his bandana—that made him tip over.  By contrast the Nibbelinks had no reason to fabricate their descriptions of the motorcycle or its driver.  They were motivated only by safety concerns after seeing the cyclist driving erratically, tipping over, and then driving away at a high speed.

The district court instructed the jurors concerning the factors to consider when deciding witness credibility.  That instruction properly framed the question for the jury.  *See State v. Shorter*, 893 N.W.2d 65, 86 (Iowa 2017) (discussing adequacy of general credibility instruction); *Hohle*, 510 N.W.2d at 849 ("To the degree any uncertainty could be said to exist, the district court's instruction to the jury on the credibility of witnesses was adequate."); *Tobin*, 338 N.W.2d at 881 (noting court "included an instruction pertaining to the credibility of witnesses, which would include the State's eyewitness identifications").  On this record, we decline to find reversible error from the absence of the eyewitness-identification instruction.

### B. Prior Acts Evidence

At trial, Officer Schaefer mentioned "knowing the history" between Carroll and Officer Koedam.  When asked what he meant by "history," Schaefer explained, "There have been previous incidents where Officer Koedam, myself, dealt with the defendant."  Despite the limine order excluding evidence of prior bad acts, except as impeachment evidence, Carroll's trial counsel did not object to this testimony.

---

[1] Officers found other motorcycles, but they belonged to Brantsen.

Carroll contends the court erred in admitting this evidence or, in the alternative, counsel was ineffective in not objecting to it.

Generally, the defendant must object to the introduction of inadmissible evidence to preserve error. *State v. Frazier*, 559 N.W.2d 34, 39 (Iowa Ct. App. 1996) (citing *State v. Delaney*, 526 N.W.2d 170, 177 (Iowa Ct. App. 1994) ("A motion in limine does not preserve error since the error does not occur until the matter is presented at trial. An objection should be made at trial to preserve error.")). But, "[i]neffective assistance of counsel is an exception to the traditional error preservation rules." *State v. Brothern*, 832 N.W.2d 187, 191 (Iowa 2013).

We review ineffective assistance of counsel claims de novo. *State v. Henderson*, 908 N.W.2d 868, 874 (Iowa 2018). We often preserve such claims for postconviction-relief proceedings where the applicant may develop supporting facts. See *State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015). But we may resolve the claims on direct appeal if the record is adequate. *Id.* To prevail, Carroll must prove by a preponderance of the evidence that counsel breached an essential duty resulting in actual prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the proof is wanting on either element, the claim fails. *See Thorndike*, 860 N.W.2d at 320.

Carroll cites Iowa Rule of Evidence 5.404(b), which provides evidence of "other crimes, wrongs, or acts" is not admissible to demonstrate a defendant has a criminal disposition or was more likely to commit the crime in question. Carroll asserts the comments about his "history" with these officers were not relevant when offered and served no other purpose than to suggest a criminal disposition.

The State responds it is not clear the officer's reference to "previous incidents" fell within the excluded evidence because they were not characterized as prior convictions, arrests, wrongful acts, or allegations of a wrongful act. The State also asserts revealing the "history" between Officer Koedam and Carroll fit with the defense strategy to disparage the investigation. In fact, defense counsel asked Carroll's wife about the unfriendly relationship between Carroll and Koedam. And Carroll himself testified to "multiple run-ins" with Koedam about the motorcycle. The defense closing argument blamed anger between the police and Carroll for preventing a thorough investigation into the possibility that "Luke" was involved. The State urges preserving this issue so trial counsel may address his strategic decisions. We agree that is the best course.

### C. Motion to Suppress

Next, Carroll argues his counsel was ineffective for failing to file a motion to suppress evidence based on search and seizure violations under the Fourth Amendment. He contends Officer Koedam had no authority to drive onto the Brantsen property or demand to speak with Carroll. According to Carroll, he was seized when Koedam asked him to step off Brantsen's porch and onto the driveway. Carroll also asserts an unlawful search occurred when the office entered the garage to examine the motorcycle.

The State argues counsel had no duty to file a motion to suppress because Carroll's claims are without merit. In the State's view, when asking to speak to Carroll, Koedam did not use physical force or a show of authority that would suggest a seizure had occurred. The State rebuts the claim of an unlawful search because the garage door was open and Carroll invited the officer to look at the

motorcycle.  Carroll testified he asked Brantsen permission to enter the garage, so Koedam had consent.  The State further asserts Koedam had "implicit license" to walk up Brantsen's driveway, step onto the porch, and knock on the front door. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013).   *But cf. State v. White*, 887 N.W.2d 172, 177 (Iowa 2016) (holding officer who pulled into defendant's driveway with lights flashing; blocked defendant's vehicle; approached defendant with uniform, badge, and firearm; and insisted defendant step off his porch and talk to him had seized defendant under the Fourth Amendment).  The State also points out Carroll was a guest at Brantsen's home and may not have had standing to challenge a seizure there.  The State summarizes: "The current record lacks proof of any constitutional violation."  The State contends "at most" we should preserve Carroll's suppression claims for further development.

Again we find the record inadequate to address the claim of ineffective assistance and preserve the issue for postconviction-relief proceedings.

**AFFIRMED.**